BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:    (858) 914-2002
E-mail: fbottini@bottinilaw.com
         achang@bottinilaw.com
         ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| ELJON LAKO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>LOANDEPOT, INC., ANTHONY HSIEH, PATRICK FLANAGAN, NICOLE CARRILLO, ANDREW C. DODSON, JOHN C. DORMAN, BRIAN P. GOLSON, DAWN LEPORE, GOLDMAN SACHS & CO. LLC, BOFA SECURITIES, INC., CREDIT SUISSE SECURITIES (USA) LLC, MORGAN STANLEY & CO. LLC, BARCLAYS CAPITAL INC., CITIGROUP GLOBAL MARKET INC., JEFFERIES LLC, UBS SECURITIES LLC, WILLIAM BLAIR & COMPANY, L.L.C., JMP SECURITIES LLC, PIPER SANDLER & CO., RAYMOND JAMES | Case No. 8:21-cv-1449<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

& ASSOCIATES, INC., NOMURA
SECURITIES INTERNATIONAL,
INC., AMERIVET SECURITIES, INC.,
and DOES 1 through 100, inclusive,

Defendants.

CLASS ACTION COMPLAINT

1   Plaintiff Eljon Lako ("Plaintiff"), individually and on behalf of all others
2   similarly situated, by Plaintiff's undersigned attorneys, alleges the following based
3   upon personal knowledge, as to Plaintiff and Plaintiff's own acts, and upon information
4   and belief, as to all other matters, based on the investigation conducted by and through
5   Plaintiff's attorneys, which included, among other things, a review of U.S. Securities
6   and Exchange Commission ("SEC") filings, analyst reports, media reports, and other
7   publicly-available information.  Plaintiff's investigation into the matters alleged herein
8   is continuing and many relevant facts are known only to, or are exclusively within the
9   custody and control of, the Defendants (defined below).   Plaintiff believes that
10  substantial additional evidentiary support will exist for the allegations set forth herein
11  after a reasonable opportunity for discovery.

12                          **NATURE OF THE ACTION**

13         1.      This is a securities class action on behalf of all persons and entities who
14  purchased or acquired shares of loanDepot, Inc. ("loanDepot" or the "Company")
15  pursuant or traceable to the Company's Registration Statement and Prospectus
16  (together, the "Offering Documents") issued in connection with the Company's
17  February 16, 2021 initial public offering (the "IPO" or the "Offering"), seeking to
18  pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "Securities
19  Act").

20         2.      Plaintiff alleges that the Registration Statement and Prospectus
21  incorporated therein (collectively, the "Registration Statement") issued in connection
22  with the IPO contained materially incorrect or misleading statements and/or omitted
23  material information that was required to be disclosed.  loanDepot is strictly liable for
24  such misstatements and omissions therefrom, as are the defendants who signed the
25  Registration Statement, the underwriters, and the controlling entities and persons.
26  Plaintiff expressly disclaims any allegation that could be construed as alleging fraud or
27  intentional or reckless misconduct.

28

CLASS ACTION COMPLAINT

3.     In its IPO, loanDepot sold 3,850,000 shares of its Class A common stock to the public at a price of $14.00 per share for total proceeds of approximately $54 million, net of underwriting discounts and commissions.  The underwriters were paid commissions of at least $3,234,000 for conducting their purported due diligence and selling loanDepot stock to the public in connection with the IPO.

4.     On November 11, 2021, the Company filed its Prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.

5.     loanDepot's Prospectus issued in connection with the IPO described the Company as follows:

> "loanDepot is a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform designed around the consumer that has redefined the mortgage process. Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S. We are the second largest retail-focused non-bank mortgage originator and the fifth largest overall retail originator, according to Inside Mortgage Finance. … Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot. We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations. … We are a data driven company. We

- 4 -

utilize data from lead acquisition, digital marketing, in-market relationships, and our servicing portfolio to identify and acquire new customers and retain our existing customers. During the last twelve months, we have analyzed, enriched, and optimized more than 9 million customer leads with a deep understanding of each potential customer's financial profile and needs. We also maintain mello DataMart, an extensive proprietary data warehouse of over 38 million contacts generated over our ten-year history. Our predictive analytics, machine learning and artificial intelligence drive optimized lead performance. …Our national brand along with our expertise in digital marketing, big data and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. …Our platform and technology create a significant financial advantage. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability."

6.   The Registration Statement was negligently prepared and omitted to disclose material adverse facts.  Specifically, Defendants failed to disclose to investors: (1) that the Company's refinance originations had already declined substantially at the

CLASS ACTION COMPLAINT

time of the IPO due to industry over-capacity and increased competition; (2) that the Company's gain-on-sale margins had already declined substantially at the time of the IPO; (3) that, as a result, the Company's revenue and growth would be negatively impacted; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

7.      By August 17, 2021, loanDepot's stock fell to $8.07 per share, a more than 42% decline from the IPO price, having plummeted in response to information reflecting the materialization of significant risks misrepresented and omitted from the Registration Statement as alleged herein.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to §10 and §22 of the Securities Act, 15 U.S.C. §77v.  The claims alleged herein arise under §§11 and 15 of the Securities Act.   *See* 15 U.S.C. §§77k, 77*l*(a)(2), and 77o, respectively.

9.      This Court has personal jurisdiction over each Defendant named herein because each conducted business in, resided in, and/or was a citizen of California at the time of the Offering and engaged in conduct giving rise to the claims asserted in this lawsuit in this District.

10.      Venue is proper because many of the Defendants named herein reside in this County or have their principal office located in this County.  Defendant Loan Depot is headquartered at 26642 Towne Centre Drive, Foothill Ranch, California 92610.

## THE PARTIES

### A.      Plaintiff

11.      Plaintiff Eljon Lako purchased loanDepot common stock pursuant and/or traceable to the Registration Statement and Prospectus issued in connection with the Company's IPO and has been damaged thereby.   Plaintiff's transactions in the

Company's stock during the Class Period are identified in the attached certification. Defendants solicited Plaintiff's purchase of loanDepot stock.

**B.     LoanDepot and the Individual Defendants**

12.     Defendant loanDepot. is a corporation with principal executive offices located at 26642 Towne Centre Drive Foothill Ranch, California.  loanDepot's Class A common stock trades on the New York Stock Exchange ("NYSE") under the symbol "LDI."

13.     Defendant Anthony Hsieh ("Hsieh") at all relevant times, was the founder, Chairman and Chief Executive Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Hsieh is a resident of Orange County, California.

14.     Defendant Patrick Flanagan ("Flanagan") at all relevant times, was the Chief Financial Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Flanagan is a resident of Orange County, California.

15.     Defendant Nicole Carrillo ("Carrillo") was, at all relevant times, the Executive Vice President of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.  Carrillo is also a resident of Orange County, California.

16.     Defendant Andrew C. Dodson ("Dodson") at all relevant times, was a director of the Company, and signed a consent form dated January 11, 2021 authorizing his name to be included in the Company's Registration Statement filed with the SEC as a director nominee of loanDepot.

17.     Defendant John C. Dorman ("Dorman") at all relevant times, was a director of the Company, and signed a consent form dated January 11, 2021 authorizing his name to be included in the Company's Registration Statement filed with the SEC as a director nominee of loanDepot.

18.     Defendant Brian P. Golson ("Golson") at all relevant times, was a director of the Company, and signed a consent form dated January 11, 2021 authorizing his name to be included in the Company's Registration Statement filed with the SEC as a director nominee of loanDepot.

19.     Defendant Dawn Lepor ("Lepor") at all relevant times, was a director of the Company, and signed a consent form dated January 11, 2021 authorizing his name to be included in the Company's Registration Statement filed with the SEC as a director nominee of loanDepot.

20.     The Defendants named above in ¶¶13-19 are collectively referred to herein as the

"Individual Defendants."

## C.     The Underwriter Defendants

21.     The following underwriters participated in the IPO, including the roadshows, due diligence, solicitation of the purchase of loanDepot stock by the public, and/or assistance in the preparation of the Offering Documents.  Each underwriter agreed to purchase the number of shares indicated in the following table. Goldman Sachs & Co. LLC, BofA Securities, Inc., Credit Suisse Securities (USA) LLC and Morgan Stanley & Co. LLC were the representatives of the underwriters.

| Underwriters | Number of Shares |
|---|---|
| Goldman Sachs & Co. LLC | 777,219 |
| BofA Securities, Inc. | 688,989 |
| Credit Suisse Securities (USA) LLC | 688,989 |
| Morgan Stanley & Co. LLC | 688,989 |
| Barclays Capital Inc. | 180,870 |
| Citigroup Global Markets Inc. | 180,870 |
| Jefferies LLC | 180,870 |
| UBS Securities LLC | 180,870 |
| William Blair & Company, L.L.C. | 92,640 |
| JMP Securities LLC | 46,938 |
| Piper Sandler & Co. | 46,938 |
| Raymond James & Associates, Inc. | 46,938 |
| Nomura Securities International, Inc. | 38,291 |
| AmeriVet Securities, Inc.. | 10,589 |
| Total | 3,850,000 |

22. The Underwriter Defendants also had an over-allotment, or "greenshoe" option, to buy an additional 577,500 shares. Upon information and belief, the Underwriters exercised that option and a total of 577,500 shares were sold to the public by the Company and Underwriters in the IPO.

23. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Goldman Sachs acted as a representative of all the underwriters. Goldman Sachs also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Goldman Sachs' participation in the solicitation of the Offering was motivated by its financial interests. Defendant Goldman Sachs conducts business in the state of California and has offices in Orange County, including an office at 8105 Irvine Center Drive, Suite 560, Irvine, California 92618.

24. Defendant BofA Securities, Inc., ("BofA") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. BofA acted as a representative of all the underwriters. BofA also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. BofA's participation in the solicitation of the Offering was motivated by its financial interests. Defendant BofA conducts business in the state of California and has offices in this District.

25. Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus. Credit Suisse acted as a representative of all

the underwriters.  Credit Suisse also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Credit Suisse's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Credit Suisse conducts business in the state of California.

26.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  Morgan Stanley acted as a representative of all the underwriters.  Morgan Stanley also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Morgan Stanley's participation in the solicitation of the Offering was motivated by its financial interests.  Defendant Morgan Stanley conducts business in the state of California and has offices in this District at 800 Newport Center Dr., Ste 500, Newport Beach, CA 92660.

27.    Defendant Barclays Capital Inc. ("Barclays") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  Barclays also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Barclays's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Barclays conducts business in the state of California and has offices at 10250 Constellation Boulevard, 24th Floor, Los Angeles, CA 90067.

28.    Defendant Citigroup Global Markets Inc. ("Citigroup") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading

Registration Statement and Prospectus. Citigroup also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Citigroup's participation in the solicitation of the Offering was motivated by its financial interests.  Defendant Citigroup conducts business in the state of California.

29.     Defendant Jefferies LLC ("Jefferies") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  Jefferies also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Jefferies's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Jefferies conducts business in the state of California.

30.     Defendant UBS Securities LLC ("UBS") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  UBS also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. UBS's participation in the solicitation of the Offering was motivated by its financial interests. Defendant Barclays conducts business in the state of California and has offices at 20 Pacifica, Suite 1500, Irvine, CA 92618.

31.     Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  William Blair also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the

CLASS ACTION COMPLAINT

Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  William Blair's participation in the solicitation of the Offering was motivated by its financial interests.  Defendant William Blair conducts business in the State of California.

32.  Defendant JMP Securities LLC ("JMP") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  JMP also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. JMP's participation in the solicitation of the Offering was motivated by its financial interests. Defendant JMP conducts business in the State of California.

33.  Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  Piper Sandler also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. Piper Sandler's participation in the solicitation of the Offering was motivated by its financial interests.  Defendant Piper Sandler conducts business in the State of California.

34.  Defendant Raymond James & Associates, Inc. ("Raymond James") was an underwriter of the Company's Offering, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's false and misleading Registration Statement and Prospectus.  Raymond James also participated in conducting and promoting the roadshow for the Offering and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Raymond James's participation in the solicitation of the

CLASS ACTION COMPLAINT

1  Offering was motivated by its financial interests.  Defendant Raymond James conducts
2  business in the State of California.

3      35.     Defendant Nomura Securities International, Inc. ("Nomura") was an
4  underwriter of the Company's Offering, serving as a financial advisor for and assisting
5  in the preparation and dissemination of the Company's false and misleading
6  Registration Statement and Prospectus.  Nomura also participated in conducting and
7  promoting the roadshow for the Offering and paying for the expenses of the Individual
8  Defendants who participated in the roadshow, including lodging and travel, among
9  other expenses.  Nomura's participation in the solicitation of the Offering was
10  motivated by its financial interests.  Defendant Nomura conducts business in the State
11  of California.

12      36.     Defendant AmeriVet Securities, Inc. ("AmeriVet") was an underwriter of
13  the Company's Offering, serving as a financial advisor for and assisting in the
14  preparation and dissemination of the Company's false and misleading Registration
15  Statement and Prospectus. AmeriVet also participated in conducting and promoting the
16  roadshow for the Offering and paying for the expenses of the Individual Defendants
17  who participated in the roadshow, including lodging and travel, among other expenses.
18  AmeriVet's participation in the solicitation of the Offering was motivated by its
19  financial interests.  Defendant AmeriVet conducts business in the state of California.

20      37.     Defendants listed in ¶¶23-36 are collectively referred to herein as the
21  "Underwriter Defendants."   LoanDepot, the Individual Defendants, and the
22  Underwriter Defendants are collectively referred to herein as the "Defendants."

23      38.     Pursuant to the Securities Act, the Underwriter Defendants are liable for
24  the false and misleading statements in the Offering's Registration Statement and
25  Prospectus.  The Underwriter Defendants' failure to conduct adequate due diligence
26  investigations was a substantial factor leading to the harm complained of herein.

27      39.     The Underwriter Defendants are primarily investment banking houses that
28  specialize, *inter alia*, in underwriting public offerings of securities.  As the underwriters

1  of the Offering, the Underwriter Defendants earned lucrative underwriting fees as a

2  result of their participation in the Offering.

3         40.    In addition, the Underwriter Defendants met with potential investors and

4  presented highly favorable, but materially incorrect and/or materially misleading,

5  information about the Company, its business, products, plans, and financial prospects,

6  and/or omitted to disclose material information required to be disclosed under the

7  federal securities laws and applicable regulations promulgated thereunder.

8         41.    Representatives of the Underwriter Defendants also assisted the Company

9  and Individual Defendants in planning the Offering.  They further purported to conduct

10 an adequate and reasonable investigation into the business, operations, products, and

11 plans of the Company, an undertaking known as a "due diligence" investigation.

12 During the course of their "due diligence," the Underwriter Defendants had continual

13 access to confidential corporate information concerning the Company's business,

14 financial condition, products, plans, and prospects.

15        42.    In addition to having access to internal corporate documents, the

16 Underwriter Defendants and/or their agents, including their counsel, had access to the

17 Company's lawyers, management, directors, and top executives to determine: (i) the

18 strategy to best accomplish the Offering; (ii) the terms of the Offering, including the

19 price at which the Company's common stock would be sold; (iii) the language to be

20 used in the Registration Statement; (iv) what disclosures about the Company would be

21 made in the Registration Statement; and (v) what responses would be made to the SEC

22 in connection with its review of the Registration Statement.  As a result of those

23 constant contacts and communications between the Underwriter Defendants'

24 representatives and the Company's management and top executives, at a minimum, the

25 Underwriter Defendants should have known of the Company's undisclosed existing

26 problems and plans, and the material misstatements and omissions contained in the

27 Registration Statement, as detailed herein.

28

43.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales of the Company's shares pursuant and/or traceable to the Offering and relevant offering materials, including to Plaintiff and the Class.

**D.     Doe Defendants**

44.     Various other individuals, partnerships, corporations, and other business entities, unknown to Plaintiff, have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.   Because the true names and capacities of these defendants are unknown to Plaintiff, Plaintiff sues these defendants as Doe Defendants 1–100.   Plaintiff will amend the complaint to show the true names and capacities of these defendants when they have been ascertained.

45.     Plaintiff is informed and believes, and on that basis alleges, that each of the fictitiously-named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were proximately caused by conduct of these fictitiously-named defendants.   Among other things, the Doe Defendants participated in the making of false and misleading statements in the Offering Documents, were control persons, and/or solicited the purchase of stock by Class Members in the IPO.

## SUBSTANTIVE ALLEGATIONS

46.     loanDepot is an independent retail mortgage lender that provides residential loans, refinance loans, and personal loan products nationwide.   The Prospectus for the Company's IPO described the Company's business as follows:

> loanDepot is a customer-centric, technology-empowered residential mortgage platform with a widely recognized consumer brand. We launched our business in 2010 to disrupt the legacy mortgage industry and make obtaining a mortgage a positive experience for consumers. We have built a leading technology platform designed around the consumer that has

redefined the mortgage process. Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S. …

Consumer-facing industries continue to be disrupted by technological innovation. The mortgage industry is no different with consumers expecting increased levels of convenience and speed. ***The residential mortgage market in the U.S. is massive—with approximately*** $**11.0 trillion of mortgages outstanding as of September 30, 2020—and is largely served by legacy mortgage originators, which require consumers to navigate time-consuming and paper-based processes to apply for and obtain mortgage loans. mello®, our proprietary end-to-end technology platform, combined with our differentiated data analytics capabilities and nationally recognized consumer brand, uniquely positions us to capitalize on the ongoing shift towards at-scale, digitally-enabled platforms***. …

***Our innovative culture and contemporary consumer brand represent key differentiators for loanDepot***. We have fostered an entrepreneurial mindset and relentlessly deliver an exceptional experience to our customers. Our guiding principle is to delight our customers by exceeding their expectations.

We are a data driven company. We utilize data from lead acquisition, digital marketing, in-market relationships, and our servicing portfolio to identify and acquire new customers and retain our existing customers. During the last twelve months, we have analyzed, enriched, and optimized more than 9 million customer leads with a deep understanding of each potential customer's financial profile and needs. We also maintain *mello DataMart*, an extensive proprietary data warehouse of over 38 million contacts generated over our ten-year history. Our predictive analytics, machine learning and artificial intelligence drive optimized lead performance.

We leverage our brand, technology and data to serve customers across our two interconnected strategies: Retail and Partner. Our Retail strategy focuses on directly reaching

consumers through a combination of digital marketing and more than 2,000 digitally-empowered licensed mortgage professionals. In our Partner strategy, we have established deep relationships with mortgage brokers, realtors, joint ventures with home builders, and other referral partners. These partnerships are valuable origination sources with lower customer acquisition costs. Our technology is a key component of the value proposition to these partner relationships, allowing us to integrate directly into our partners' native systems. We maintain integrated referral relationships with several leading brands, including a partnership with one of the 10 largest U.S. retail banks by total assets. During 2019, our Retail strategy produced 72% of our origination volume, with our Partner strategy representing the remaining 28%.

Our digital-first approach across our Retail and Partner strategies leverages the power of *mello®* to create a streamlined experience for consumers. Our predictive models route leads to the right loan officer at the right time to optimize the consumer's experience and best serve their needs. Based on each consumer's needs and preferences, leads are directed to in-house or in-market loan officers, team members at our centralized operations locations, or our digital self-service platform. Our in-market loan officers are able to leverage their long-term relationships as well as our proprietary *mello®* platform and loanDepot brand, driving improved profitability per loan officer.

Our national brand along with our expertise in digital marketing, big data and marketing analytics, not only drives new customer acquisition, but also maximizes retention and customer lifetime value. We leverage these capabilities to "recapture" existing customers for subsequent refinance and purchase transactions. ***Our recapture rates are among the highest in the industry — for the nine months ended September 30, 2020, our organic refinance consumer direct recapture rate was 61% highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18% for the three months***

CLASS ACTION COMPLAINT

*ended September 30, 2020* according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. ***Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins***.

***We have significantly increased our originations market share from 1.0% in 2014 to 2.6% for the first nine months of 2020, and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share***. Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations representing 41% of total originations in 2019. We have a well-defined plan to accelerate this growth by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.

***Our platform and technology create a significant financial advantage***. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. ***For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry***.

CLASS ACTION COMPLAINT

47. Prior to the IPO, the Company was majority owned by founder and CEO Anthony Hsieh (61%) and 38% by Parthenon Capital, as reflected in the following chart:

| Name of Beneficial Owner | Class A Common Stock Beneficially Owned after giving effect to the Reorganization Transactions (on a fully exchanged and converted basis) (1) (2) | | | | | | Class D Common Stock Beneficially Owned after giving effect to the Reorganization Transactions (on a fully exchanged and converted basis) (1) (3) | | | | | | Combined Voting Power (4) | | |
| | Before This Offering | | After This Offering | | After This Offering & Option Exercise | | Before This Offering | | After This Offering | | After This Offering & Option Exercise | | Before This Offering | After This Offering | After This Offering & Option Exercise |
| | # | % | # | % | # | % | # | % | # | % | # | % | % | % | % |
| Entities affiliated with Parthenon Capital (5) | 124,810,608 | 38.4 | 123,309,280 | 37.9 | 123,084,080 | 37.9 | 121,368,600 | 37.6 | 119,912,600 | 37.1 | 119,694,200 | 37.1 | 38.6 | 38.5 | 38.5 |
| *Executive Officers and Directors:* | | | | | | | | | | | | | | | |
| Anthony Hsieh (6) | 130,837,895 | 40.3 | 129,128,832 | 39.7 | 128,872,472 | 39.7 | — | | — | | — | | 61.3 | 61.1 | 61.1 |
| Patrick Flanagan (7) | — | | — | | — | | — | | — | | — | | * | | |
| Jeff Walsh (7) | — | | — | | — | | — | | — | | — | | * | | |
| Jeffrey DerGurahian (7) | — | | — | | — | | — | | — | | — | | * | | |
| Brian Golson (8) | — | | — | | — | | — | | — | | — | | * | | |
| Andrew Dodson (8) | — | | — | | — | | — | | — | | — | | * | | |
| John Dorman (7) | — | | — | | — | | — | | — | | — | | * | | |
| Dawn Lepore (7) | — | | — | | — | | — | | — | | — | | * | | |
| Nicole Carrillo (7) | — | | — | | — | | — | | — | | — | | * | | |
| Executive Officers and Directors as a group (9 person | 130,837,895 | 40.3 | 129,128,832 | 39.7 | 128,872,472 | 39.7 | — | | — | | — | | 61.3 | 61.1 | 61.1 |

48. The Company's IPO was a means for the Company's controlling shareholder, Mr. Hsieh, and the Company's early partner and investor, Parthenon, to cash out their illiquid stock in the Company. Of the IPO proceeds, the Company's insiders (principally Hsieh and Parthenon) sold 1,456,000 shares of Class A Common Stock compared to 2,394,000 shares sold by by the Company. Thus, the Company's insiders received approximately 38% of all proceeds from the IPO.

CLASS ACTION COMPLAINT

49.     In addition, shortly before the IPO, the Company's insiders caused the Company to make large cash payments to them.  In November 2020, the Company paid profit distributions of $278.8 million to certain of its unitholders, namely Hsieh and Parthenon.   In December 2020, the Company distributed $71.1 million to the unitholders.  In addition, shortly prior to the IPO, the Company's related entity LD Holdings distributed an additional $159 million to the unitholders.  Moreover, on April 30, 2021 the Company distributed an additional $146.2 million to the unitholders.  Thus, shortly before and/or after the IPO, ***the Company's insiders siphoned off over $655 million in cash from the Company***.

50.     On November 12, 2020, the Company filed a draft Registration Statement on Form DRS with the SEC.   On January 11, 2021, the Company filed a draft Registration Statement on Form S-1 with the SEC.  Following several amendments made in response to comments received by the SEC, the SEC declared the Registration Statement effective on February 10, 2021.  On February 16, 2021, loanDepot filed the Prospectus with the SEC.  The Registration Statement and Prospectus were utilized in the Offering.

51.     Each of the Individual Defendants signed the Registration Statement or signed consent forms dated January 11, 2021 authorizing their names to be included in the Registration Statement as director nominees of loanDepot.

52.     On February 16, 2021, the Company filed its Prospectus with the SEC on Form 424B4.

53.     loanDepot thereafter announced the pricing of its initial public offering of 3,850,000 Class A shares at a price of $14 per share.  The Company announced that its shares had been approved for listing on the NYSE under the symbol "LDI."

54.     The Offering Documents used to effectuate the Company's IPO were negligently prepared, and contained false and misleading statements and material omissions.

CLASS ACTION COMPLAINT

55.     The Registration Statement stated that the Company's "innovative technology" had allowed it realize significantly increased revenues and profitability:

> "We have demonstrated our ability to grow our business and market share, having grown from a de novo start-up in 2010 to the second largest non-bank retail originator in the U.S. with a 2.6% share of a $11.0 trillion mortgage market as of September 30, 2020. We believe that we are well positioned to continue our market share growth through both our Retail strategy, where we have invested in our team members and technology to enable rapid scaling, and our Partner strategy, where independent brokers, in addition to joint venture and integrated referral partners, increasingly choose to work with us based on our reputation for excellent customer service and seamless user experiences. ***Our growth has accelerated in recent quarters as our long-term investments in brand marketing and innovative technology have helped us achieve industry-leading growth and profitability***."

> "We believe that ***continuing to make these investments will allow us to grow market share***, ***increase customer retention and deliver enhanced returns that will ultimately enable a virtuous cycle of further investment and returns***."

56.     The Offering Documents contained the following chart representing to investors that loanDepot had experienced rapidly increasing loan origination growth:

CLASS ACTION COMPLAINT



57. The Offering Documents also stated:

We've created a company that is built to serve customers throughout the entire loan transaction, from the onset of the purchase or refinance decision through loan closing and servicing. ***We now possess roughly 3% market share of annual mortgage origination volumes***, which makes up part of the $11T total addressable market. Thanks to our brand investment over time, we are also one of the most recognized brands in the industry today. ***All of this gives us enormous runway***.

58. The Prospectus also stated:

***We*** originated $79.4 billion of loans for the twelve months ended September 30, 2020 and ***experienced 116% year-over-year origination volume growth for the nine months ended September 30, 2020***.

59. In another section of the Offering Documents discussing potential competition, the Company represented that its brand and technology protected it against potential competition and that there were significant barriers to entry:

We believe that we are one of only two non-banks with a nationally-recognized consumer brand in the U.S. retail mortgage origination industry. Since the Company's launch in 2010, we have invested over $1.2 billion in marketing and the promotion of our brand, and we believe there are

significant barriers-to-entry in creating a brand comparable to ours.

60.    The Offering Documents also trumpeted loanDepot's success in achieving higher-than-average recapture rates and profit margins in its industry, and stated that loanDepot was well-positioned to protect its high profit margins:

> ***Our recapture rates are among the highest in the industry***—for the nine months ended September 30, 2020, ***our organic refinance consumer direct recapture rate was 61%*** *highlighting the efficacy of our marketing efforts and the strength of our customer relationships. This compares to an industry average refinance recapture rate of only 18*% for the three months ended September 30, 2020 according to Black Knight Mortgage Monitor. In addition, we achieved an overall organic recapture rate of 47% for the nine months ended September 30, 2020. Our recapture originations have lower customer acquisition costs than originations to new customers, positively impacting our profit margins.

61.    The Prospectus also stated that loanDepot had significantly increased its market share and was well-positioned to protect and grow that market share through its proprietary "platform and technology" which supposedly gave loan Depot a "significant financial advantage":

> ***We have significantly increased our originations market share from 1.0% in 2014 to 2.6% for the first nine months of 2020***, *and our strong consumer brand and proprietary technology platform have positioned us to continue gaining additional share*. Our Retail and Partner strategies have led to a balanced mix of purchase and refinance mortgages, with purchase originations

representing 41% of total originations in 2019. ***We have a well-defined plan to accelerate this growth*** by expanding upon our technological and brand advantages, growing our market share in both purchase and refinance markets, and further increasing customer retention and lifetime value. Secular demographic and housing market tailwinds provide further support for our competitive advantages.

***Our platform and technology create a significant financial advantage***. Our brand effectiveness and marketing capabilities optimize our customer acquisition costs, and our automation reduces unnecessary expenses throughout the origination process. We are able to scale quickly and efficiently which allows us to grow both transaction volume and profitability. During the COVID-19 pandemic, our technology platform and culture enabled us to hire, train and onboard over 3,500 new team members remotely. Our growth and profitability during the last nine months is further evidence of the scalability of our platform and validates the investments we have made in our brand and our technology. For the nine months ended September 30, 2020, we generated $63.4 billion in originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1,465.9 million in net income and $1,085.9 million in adjusted net income, making us one of the fastest-growing and most profitable companies in our industry.

CLASS ACTION COMPLAINT

62.    The Offering Documents represented the following with respect to the Company's gain-on-sale margins:

> While the financial markets have demonstrated significant volatility due to the economic impacts of COVID-19, interest rates have fallen to historic lows resulting in increased mortgage refinance originations and favorable margins. Our efficient and scalable platform has enabled us to respond quickly to the increased market demand. Market demand in 2020 was driven by a prolonged period of historically low interest rates. This demand contributed to gain on sale margins reaching levels that the Company does not believe will be sustained in future years and could result in decreases in revenue.

63.    This statement was false and misleading because the Company was already experiencing lower gain-on-sale margins.  Instead of disclosing this existing fact, the Offering Documents falsely stated that gain-on-sale margins and revenues could be impacted "in future years."  Including a misleading disclosure that margins and revenues could be impacted in "future years" when in fact the margins and revenues *were already been adversely affected* and would continue to be affected in the very next quarter (not year) was itself a false and misleading statement.

64.    The representations in the Offering Documents were also false and misleading because, at the time of the IPO, loanDepot was already experiencing significantly increased competition, greatly reduced originations, and lower gain-on-sale margins.  Neither loanDepot's supposedly proprietary technology or platform or other touted advantages were proving successful in fighting this competition.  Instead, Defendants concealed from the Offering Documents the fact that loanDepot was being forced to lower prices/rates in order to combat the significantly increased competition, which was leading and would inexorably lead to lower margins and profits.  In addition, its efforts to protect its market share by reducing prices/rates were not enough to protect

its loan originations, which were declining and thus leading to reduced revenues. loanDepot failed to disclose these material facts in the Offering Documents, thus making the statements above misleading.

65.     Indeed, when loanDepot announced disappointing Q2 2021 results on August 3, 2021, Defendant Hsieh admitted that everything about loanDepot's business is "highly predictable" and thus that loanDepot had perfect visibility at the time of the IPO as to where its business was and was going.  On the conference call with analysts to discuss loanDepot's Q2 2021 earnings on August 3, 2021, Defendant Hsieh stated:

> **[Anthony Hsieh]:**  "James, this is certainly not our first rodeo. ***Everything here is highly predictable. There's been very, very little surprise***."

66.     loanDepot never disclosed this information in the Offering Documents. This omitted information was material because the Company's loan originations, growth rate, and margins were highly material to investors.  Indeed, the entire business of loanDepot is loan originations and loan refinancing and thus the misrepresentations and omissions alleged herein concerned the Company's core (and only) product.

67.     LoanDepot had its lawyers craft boilerplate disclosures that it could use in the future to try to argue that the undisclosed facts were actually disclosed.  The following generic and misleading disclosure in the Offering Documents was included by loanDepot for exactly this purpose:

> "Our loan originations, particularly our refinance mortgage loan volume, are dependent on interest rates and are expected to decline *if interest rates increase*. Our loan origination activities are also subject to overall market factors that can impact our ability to grow our loan production volume. For example, ***increased competition*** from new and existing market participants, slow growth in the level of new home purchase activity or reductions in the overall level of refinancing activity ***can impact our ability to continue to grow our loan origination***

- 26 -

1
2
3

***volume, and we may be forced to accept lower margins in order to continue to compete and keep our volume of activity consistent with past or projected levels.***

4       68.     This alleged disclosure was itself false and misleading.  Telling investors

5    that potential, theoretical increased competition "could" impact revenues and margins

6    is a far cry from telling investors that the company ***was already experiencing***

7    significantly increased competition that had already forced it to accept lower margins

8    in order to stave off such competition.  Moreover, interest rates did not increase from

9    the time of the IPO to the Company's announcement of significantly reduced revenues

10   and margins in Q2 2021 (less than six months after the IPO).  Interest rates stayed flat

11   and even were lowered during this time period.  Thus, the Company's boilerplate

12   alleged disclosures in the Offering Documents actually misled investors rather than

13   warning them about known, existing facts, as Defendants had an obligation to do under

14   the federal securities laws.

15       69.     Rather than disclose the known, existing adverse facts, the Offering

16   Documents repeatedly touted the fact that the Company had been extremely successful

17   (even during Covid) of increasing market share, profit margins, and staving off

18   competition:

19       70.     "While the financial markets have demonstrated significant volatility due

20   to the economic impacts of COVID-19, interest rates have fallen to historic lows

21   resulting in increased mortgage refinance originations and favorable margins.  Our

22   efficient and scalable platform has enabled us to respond quickly to the increased

23   market demand.  We have highlighted below the key steps we have undertaken since

24   the onset of the pandemic to position our platform for continued success:

25
26   •   Maintained higher liquidity levels from an increase in cash from retained earnings.

27
28   •   Increased our total loan funding capacity with our current lending partners.

- Stepped up protocols related to verification of key metrics such as employment and income to ensure the highest quality underwriting standards are maintained.

- Transitioned our workforce to working remotely as of March 19, 2020."[1]

71.     The Company's Offering Documents represented that the Company was experiencing rapid growth in revenues and margins and that the Company's business, performance, prospects and products were well-positioned to continue such high growth rate and margins, while omitting these known trends and facts that had already had a materially unfavorable impact on the Company's revenues and business at the time of the IPO.  *See* Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303(a)(3)(ii) (requiring that the materials incorporated in a registration statement disclose all "known trends or uncertainties" reasonably expected to have a material, unfavorable impact on a company's operations).

72.     The Registration Statement contained pages and pages of numerous generalized possible "Risk Factors" that might occur and "[i]n case" they did actually occur, then loanDepot's financial condition and results of operation "***could*** be adversely affected."  Those statements were false or misleading and omitted material information for the reasons stated above in paragraph 68.

73.     The statements identified above that the Company made in the Offering Documents were materially false and misleading when made because, in addition to what was stated above, they failed to disclose:

    a. that the Company's refinance originations had already declined substantially at the time of the IPO due to industry over-capacity and increased competition;

    b. that the Company's gain-on-sale margins had already declined substantially at the time of the IPO;

---

[1] See Prospectus at p. 106.

CLASS ACTION COMPLAINT

c. that, as a result, the Company's revenue and growth would be negatively impacted;

d. that the Company had already been forced to embark on a significant expense reduction plan due to the significantly lower growth and refinance originations that the Company was experiencing;

e. that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis; and

f. that the Company's business, prospects and ability to achieve growth had been materially impaired by the time of the IPO as a result of adverse industry, sales and earnings trends.

74.    Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), required defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and that each risk factor "adequately describes the risk." The failure of the Registration Statement to disclose that the Company was experiencing adverse growth and earnings trends, including significantly increased competition in the market for loan originations, reduced gain-on-sale margins, and lower revenues, violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations. This failure also violated 17 C.F.R. §229.503, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in shares of the Company's common stock speculative or risky.

75.     By August 17, 2021, loanDepot's stock had declined 42% from its IPO after it disclosed disappointing Q2 2021 results and provided significantly lower guidance for its business.

76.     At the time of the filing of this action, loanDepot's stock was trading in the range of $8 per share, having plummeted in response to information reflecting the materialization of significant risks misrepresented and omitted from the Registration Statement as alleged herein.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action under California Code of Civil Procedure §382 as a class action on behalf of a class consisting of all purchasers of loanDepot, Inc. common stock in and/or traceable to the Company's IPO and who were damaged thereby (the "Class"). The Class Period is February 16, 2021 to the date of the filing of this complaint. Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

78.     The members of the Class are so numerous that joinder of all members is impracticable. loanDepot sold at least 3,850,000 shares of its common stock in the IPO. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members of the proposed Class. The members of the proposed Class may be identified from records maintained by loanDepot or its transfer agent and may be notified of the pendency of this action by mail, using customary forms of notice that are commonly used in securities class actions.

79.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct.

80.     Plaintiff will fairly and adequately protect the interests of the members of

1    the Class and has retained counsel competent and experienced in class and securities

2    litigation.

3          81.    Common questions of law and fact exist as to all members of the Class

4    and predominate over any questions solely affecting individual members of the Class.

5    Among the questions of law and fact common to the Class are:

6                 a.  whether the federal securities laws were violated by Defendants' acts

7                     as alleged herein;

8                 b.  whether the Registration Statement and Prospectus contained

9                     materially false and misleading statements and omissions; and

10                c.  to what extent Plaintiff and members of the Class have sustained

11                    damages and the proper measure of damages.

12         82.    A class action is superior to all other available methods for the fair and

13   efficient adjudication of this controversy since joinder of all members is impracticable.

14   Furthermore, as the damages suffered by individual Class members may be relatively

15   small, the expense and burden of individual litigation make it impossible for members

16   of the Class to individually redress the wrongs done to them.  There will be no difficulty

17   in the management of this action as a class action.

18                          **FIRST CAUSE OF ACTION**
                     **Violation of §11 of the Securities Act Against**
19   **loanDepot, the Individual Defendants and the Underwriter Defendants**

20

21         83.    Plaintiff repeats and realleges each and every allegation contained above

22   as if fully set forth herein.

23         84.    This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C.

24   §77k, on behalf of the Class, against loanDepot, the Individual Defendants and the

25   Underwriter Defendants.

26         85.    The Registration Statement was inaccurate and misleading, contained

27   untrue statements of material facts, omitted facts necessary to make the statements

28

1   made therein not misleading, and omitted to state material facts required to be stated
2   therein.

3        86.   The Company is the issuer of the securities purchased by Plaintiff and the
4   Class.  As such, the Company is strictly liable for the materially inaccurate statements
5   contained in the Registration Statement and the failure of the Registration Statement to
6   be complete and accurate.

7        87.   The Individual Defendants each signed the Registration Statement.  As
8   such, each is strictly liable for the materially inaccurate statements contained in the
9   Registration Statement and the failure of the Registration Statement to be complete and
10  accurate, unless they are able to carry their burden of establishing an affirmative "due
11  diligence" defense.  The Individual Defendants each had a duty to make a reasonable
12  and diligent investigation of the truthfulness and accuracy of the statements contained
13  in the Registration Statement and ensure that they were true and accurate, that there
14  were no omissions of material facts that would make the Registration Statement
15  misleading, and that the documents contained all facts required to be stated therein.  In
16  the exercise of reasonable care, the Individual Defendants should have known of the
17  material misstatements and omissions contained in the Registration Statement and also
18  should have known of the omissions of material fact necessary to make the statements
19  made therein not misleading. Accordingly, the Individual Defendants are liable to
20  Plaintiff and the Class.

21       88.   The Underwriter Defendants each served as underwriters in connection
22  with the Offering.  As such, each is strictly liable for the materially inaccurate
23  statements contained in the Registration Statement and the failure of the Registration
24  Statement to be complete and accurate, unless they are able to carry their burden of
25  establishing an affirmative "due diligence" defense.  The Underwriter Defendants each
26  had a duty to make a reasonable and diligent investigation of the truthfulness and
27  accuracy of the statements contained in the Registration Statement.  They had a duty
28  to ensure that such statements were true and accurate, there were no omissions of

material facts that would make the Registration Statement misleading, and the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Underwriter Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material facts necessary to make the statements made therein not misleading.  Accordingly, each of the Underwriter Defendants is liable to Plaintiff and the Class.

89.     By reason of the conduct herein alleged, each of the Individual Defendants, the Underwriter Defendants, and loanDepot violated §11 of the Securities Act.

90.     Plaintiff acquired the Company's common stock pursuant or traceable to the Registration Statement and without knowledge of the untruths and/or omissions alleged herein.  Plaintiff sustained damages, and the price of the Company's common stock declined substantially due to material misstatements in the Registration Statement.

91.     This claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

92.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from loanDepot, the Individual Defendants and the Underwriter Defendants, and each of them, jointly and severally.

## SECOND CAUSE OF ACTION
### Violation of §15 of the Securities Act Against
### All Individual Defendants

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.

95.     The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, had the power to influence, and exercised control over the Company to cause it to engage in the conduct complained of herein.

96.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to §15 of the Securities Act.  As a direct and proximate result of the wrongful conduct, Class members suffered damages in connection with their purchases of the Company's shares.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action and certifying Plaintiff as the Class Representative;

B.     Awarding Plaintiff and the other members of the Class compensatory damages;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

D.     Awarding Plaintiff and the other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  September 03, 2021                    BOTTINI & BOTTINI, INC.
                                              Francis A. Bottini, Jr. (SBN 175783)

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

/s Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:   (858) 914-2002
Email:       fbottini@bottinilaw.com
             achang@bottinilaw.com
             ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff*

- 35 -
CLASS ACTION COMPLAINT