1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Court-Appointed Lead Plaintiff
Arthur Gary LaFrano, Additional Plaintiff
Adam Doban, and Lead Counsel for the Class*

[additional counsel on signature page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR GARY LAFRANO and ADAM DOBAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>LOANDEPOT, INC.; ANTHONY HSIEH; PATRICK FLANAGAN; NICOLE CARRILLO; ANDREW C. DODSON; JOHN C. DORMAN; BRIAN P. GOLSON; DAWN LEPORE; GOLDMAN SACHS & CO. LLC; BOFA SEURITIES, INC.; CREDIT SUISSE SECURITIES (USA) LLC; MORGAN STANLEY & CO. LLC; BARCLAYS CAPITAL INC.; CITIGROUP GLOBAL MARKETS INC.; JEFFERIES LLC; UBS SECURITIES LLC; WILLIAM BLAIR & COMPANY, L.L.C.; JMP | Consolidated Case Nos.: 8:21-cv-01449-JLS-JDE and 8:21-cv-01513-JLS-JDE<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

-1-

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SECURITIES LLC; PIPER SANDLER
& CO.; RAYMOND JAMES &
ASSOCIATES, INC.; NOMURA
SECURITIES INTERNATIONAL,
INC.; and AMERIVET SECURITIES,
INC.,

                    Defendants.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Court-appointed Lead Plaintiff Arthur Gary LaFrano ("Lead Plaintiff") and additional plaintiff Adam Doban ("Additional Plaintiff" or "Doban," and with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned counsel, hereby bring this Amended Consolidated Class Action Complaint (the "Complaint") against loanDepot, Inc. ("loanDepot" or the "Company"), Anthony Hsieh, Patrick Flanagan, Nicole Carrillo, Andrew C. Dodson, John C. Dorman, Brian P. Golson, Dawn Lepore, Goldman Sachs & Co. LLC, BofA Securities, Inc., Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Citigroup Global Markets Inc., Jefferies LLC, UBS Securities LLC, William Blair & Company, L.L.C., JMP Securities LLC, Piper Sandler & Co., Raymond James & Associates, Inc., Nomura Securities International, Inc., and AmeriVet Securities, Inc. (collectively, "Defendants").

Plaintiffs' claims are brought upon personal knowledge, as to Plaintiffs and Plaintiffs' own acts, and upon information and belief, as to all other matters, based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review and analysis of: (1) reports and documents filed by loanDepot with the U.S. Securities and Exchange Commission ("SEC"); (2) reports issued by securities analysts concerning loanDepot; (3) press releases, news articles, transcripts, and other public statements issued by or about loanDepot; (4) an investigation conducted by Plaintiffs' attorneys, including interviews with former employees of loanDepot; (5)

confirmation of allegations made in a civil action brought against loanDepot and certain of its executives by its former Chief Operating Officer; and (6) other publicly-available information concerning Defendants.   Plaintiffs' investigation into the matters alleged herein is continuing and many relevant facts are known only to, or are exclusively within the custody and control of, Defendants.   Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a securities class action asserting (1) claims under sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") on behalf of all persons and entities who purchased or acquired shares of loanDepot's Class A common stock[1] pursuant or traceable to the Company's Registration Statement (defined herein) issued in connection with the Company's February 16, 2021 initial public offering (the "IPO"), and (2) claims under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), on behalf of all persons and entities who purchased or acquired shares of loanDepot's common stock from March 16, 2021 through September 22, 2021, both dates inclusive.

2.     Plaintiffs' claims arise from Defendants' misrepresentations about three critical facets of loanDepot's business.   *First*, beginning in the fall of 2020, as the IPO

approached, Defendant Hsieh—the Company's CEO—directed the creation of an initiative to systematically violate mandatory loan origination and underwriting requirements in order to close loans as quickly as possible and thus boost the Company's performance and capture additional market share.  After repeatedly berating his Chief Operating Officer for insisting on following applicable loan origination and underwriting guidelines, in November 2020 Hsieh initiated "Project Alpha," an initiative to identify thousands of loans and close them as quickly as possible.  To accomplish this, the project was structured to disregard documentation requirements.  junior and inexperienced personnel were given new authority to close loans, completely bypassing the Company's underwriting department.  As Project Alpha progressed, within weeks Hsieh oversaw the creation of Project Beta, which applied the same approach to thousands of additional loans.

3.      These two projects, Alpha and Beta, involved systematic and widespread violations of loan origination and underwriting guidelines that applied in loanDepot's highly regulated industry.  Indeed, the Chief Operating Officer, after being instructed by Hsieh to ensure that loans were closed quickly, even without proper documentation, specifically told the company's Chief Revenue Officer that Hsieh's directive was illegal.  Nevertheless, Project Alpha and Project Beta continued to move forward at Hsieh's behest, involving systematic violations of federal law passed in the aftermath of the

---

[1] Unless otherwise noted herein, all references to loanDepot's common stock are to its Class A

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

financial crisis of 2008.  In addition, these projects involved violations of mandatory guidelines promulgated by Fannie Mae, Freddie Mac, and Ginnie Mae, endangering loanDepot's relationship with these entities, without which loanDepot cannot function. Furthermore, the loan origination processes followed in Project Alpha and Project Beta violated the Company's representations and warranties to investors in securities created from its mortgage loans, placing the Company at risk of liability to repurchase those loans from investors. Thus, Project Alpha and Project Beta were material to the Company's financial condition and created material risks.  Nevertheless, Project Alpha and Project Beta were not disclosed in the Registration Statement (defined below) for the Company's February 2021 initial public offering or in any of the Company's public filings during the Class Period.

4.    *Second*, for several years the Company had improperly collected double daily interest from refinance borrowers, inflating the Company's interest income.  The matter was brought to Defendant Hsieh's attention in late 2019.  At that time, however, Hsieh personally decided that the Company would strategically return improperly collected interest only to borrowers in states with active attorneys general that might be expected to act on behalf of affected borrowers.  Hsieh determined that the Company would keep the interest charges collected from borrowers in other states.  Instead of

---

common stock.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

disclosing these matters, the Company misleadingly represented its compliance practices to reassure investors.

5.    *Third*, the Registration Statement misrepresented to investors that the Company's "gain on sale margins"—a critical metric of the Company's performance, closely tracked by analysts—*could* decline in the future.  At the time, gain on sale margins throughout the industry were expected to face pressure as market conditions changed.  A key question was how long the Company could sustain the high gain on sale margins it reported in the Registration Statement.  As the Company began to reveal only a week after its initial public offering, its gain on sale margins began rapidly declining in the fourth quarter of 2020—which ended six weeks before the IPO—and continued to fall in the first quarter of 2021.

6.    The Securities Act claims asserted in this Complaint arise from misleading statements in the Registration Statement, which was negligently prepared, contained untrue statements of material fact, and omitted statements of material fact required to be stated therein or necessary to make the statements therein not misleading. The Registration Statement misleadingly omitted to disclose Project Alpha and Project Beta; misrepresented the Company's compliance practices and omitted to disclose its years-long improper collection of double interest payments from borrowers; and misled investors concerning the Company's rapidly declining gain on sale margins; On the basis of these material misstatements, over four million shares of loanDepot's Class A

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

common stock were sold to investors at $14 per share, and traded thereafter in the secondary market.

7.     Following its initial public offering, the Company fraudulently concealed the existence of Project Alpha and Project Beta.  Even as investors that had purchased mortgage-backed securities including those loans began requesting that LoanDepot repurchase the deficient loans because of LoanDepot's faulty loan origination and underwriting practices, the Company sought to reassure investors in its common stock. The Company told investors that unspecified "loan origination noncompliance" allegations made by its former Chief Operating Officer in a demand letter received by the Company in December 2020 were meritless.   On September 21, 2021, after mediation with the Company failed, the former Chief Operating Officer filed a public complaint revealing Project Alpha and Defendant Hsieh's personal involvement therein.

8.     As investors began to learn the truth regarding the facts misrepresented and concealed by Defendants, and the risks hidden by Defendants materialized, the Company's stock price fell precipitously, injuring investors.   After the initial public offering at $14 per share, loanDepot's common stock jumped to a high of $31.48 the following day.  By the date of the initial complaint in this action, it had fallen to $8 per share.  LoanDepot's stock now trades at less than $2 per share.

## II.     JURISDICTION AND VENUE

9.     Counts I-II asserted herein arise under and pursuant to Sections 11 and 15

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

of the Securities Act (15 U.S.C. §§ 77k and 77o).  Counts III-IV asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).  loanDepot is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' acts alleged herein took place in this Judicial District.

12.     In connection with the acts alleged in this complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     BACKGROUND ALLEGATIONS

### A.     Background Concerning loanDepot

13.     loanDepot is an independent, non-bank retail mortgage lender that provides residential and refinance loans, as well as personal loan products, to borrowers in the

United States.  The Company claims that its focus on the customer experience and use of innovative technologies gives it a competitive advantage that has driven its growth.

14.     Defendant Hsieh founded loanDepot in 2010 in a bid to "disrupt" the mortgage industry by focusing on the customer experience and employing new technologies.  loanDepot touts "mello," its "proprietary end-to-end technology platform," as its greatest competitive strength.  "*mello*® drives streamlined customer experiences and operational efficiency throughout the entire lifecycle of a mortgage loan, including fully digital capabilities for customer acquisition, application, processing, and servicing," the Company boasted in the offering documents for the IPO.  LoanDepot claims that, in contrast to "legacy" mortgage originators, which "require consumers to navigate time-consuming and paper-based processes to apply for and obtain mortgage loans," mello offers a friendly, efficient, and easy user interface and experience.

15.     Furthermore, according to loanDepot, mello has "predictive models [that] route leads to the right loan officer at the right time to optimize the consumer's experience and best serve their needs," contributing to borrower satisfaction and increasing the likelihood that loanDepot will gain the borrower's business, and not just for that particular loan.  loanDepot has boasted of its ability to "recapture" existing customers for subsequent mortgage loans as a result of its strong customer relationships, as well as its investment in marketing and use of big data.

16.     The mortgage market—and specifically the primary mortgage market in which loanDepot operates (as explained below)—is highly competitive.  LoanDepot is up against large commercial banks and other institutions with significantly greater resources and access to capital, not to mention established brand identities and widespread access to customers via their banking functions.

17.     The highly regulated nature of the mortgage market, in particular restrictive loan underwriting standards, mean that the various primary mortgage lenders offer relatively similar products, limiting the ability of each lender to distinguish itself and obtain market share from its competitors.

18.     According to loanDepot, mello is what sets it apart.  "Our digital-first approach has allowed us to become one of the fastest-growing, at-scale mortgage originators in the U.S.," the Company stated.

19.     Indeed, LoanDepot has grown substantially since its founding.  From 1% market share in 2014, the Company claims that it captured 2.6% market share for the first nine months of 2020.  For that period, loanDepot reported $63.4 billion in loan originations (116% year-over-year growth), $3.0 billion in revenue (227% year-over-year growth), $1.4 billion in net income and $1 billion in adjusted net income.

20.     The Company conducted an initial public offering of its common stock in February 2021, as further discussed below.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**B.      The U.S. Mortgage Market**

21.      In the United States, the mortgage market includes both a primary market, which consists of several thousand lenders (such as loanDepot) that lend directly to homeowners, and a secondary market.  Well over half of the mortgage loans originated in the primary market are held by the originating lender for only a short period of time, and then sold on the secondary market.

22.      The secondary market is nearly entirely dependent on three government agencies, *i.e.*, Fannie Mae (the Federal National Mortgage Association), Freddie Mac (the Federal Home Loan Mortgage Corporation), and Ginnie Mae (the Government National Mortgage Association).   Freddie Mac and Fannie Mae are government-sponsored entities that purchase mortgage loans and securitize them.  (Freddie Mac and Fannie Mae are referred to herein as the "GSEs.")  Ginnie Mae is owned by the U.S. federal government, and primary market lenders can, through Ginnie Mae, securitize mortgage loans guaranteed by the Federal Housing Administration ("FHA") and the Department of Veterans Affairs ("VA").   The resulting mortgage-backed securities ("MBS") created with the involvement of Freddie Mac, Fannie Mae, or Ginnie Mae are purchased by investors, in particular institutional investors, banks, and government-related entities, including foreign central banks.  Fannie Mae and Freddie Mac provide guarantees for the underlying mortgage loans, while Ginnie Mae guarantees the securities themselves.  These guarantees bolster the confidence of investors to purchase

the MBS into which mortgages are packaged.  In addition, some loans are securitized by private banks for sale to investors.  These "private label" MBS were at the center of the 2008 financial crisis and are far less common today.

23.    This arrangement of a primary and secondary market fosters greater liquidity for primary market lenders, enabling them to extend more loans than would be possible were they to hold mortgages on their books and collect periodic interest and principal payments as they were made.

24.    This is true for loanDepot, which does not, generally, hold on its own books the mortgages that it originates.  As a result, collecting interest payments on loans it has originated is not a primary source of loanDepot's income.  Rather, the Company's income is principally derived from gains on originating mortgage loans, selling those loans to investors, servicing mortgage loans, and charging fees for settlement services related to originating and selling such loans.  In essence, primary market firms like loanDepot earn as revenue the difference between the interest rate charged to borrowers and the lower rate paid to the secondary market buyer when loans are sold.

25.    In fact, selling mortgage loans is loanDepot's primary source of income. For the nine months ended September 30, 2020, loanDepot's unaudited financial statement reported total net revenues of approximately $3.01 billion, of which approximately $2.87 billion—over 95%—consisted of net gains on the origination and

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

sale of loans.  Thus, loanDepot's ability to achieve a gain on the sale of mortgage loans that it originates is essential to its business and of critical importance to investors.

26.     The significance of Fannie Mae, Freddie Mac, and Ginnie Mae in the secondary mortgage marketplace cannot be overstated.  This is true for the market as a whole and specifically for loanDepot.  According to the Registration Statement for loanDepot's initial public offering, loanDepot is "focused almost exclusively on originating agency-conforming and government mortgage loans, including FHA and VA loans, directly to qualified borrowers and selling these loans into the secondary market." Thus, the Company's ability to sell loans to Fannie Mae and Freddie Mac, and through Ginnie Mae, is fundamental to its business model and operations.

## IV.     SECURITIES ACT ALLEGATIONS

### A.     Securities Act Parties

#### 1.     Plaintiffs

27.     Lead Plaintiff Arthur Gary Lafrano, as set forth in Appendix A hereto, acquired loanDepot common stock pursuant and traceable to the Registration Statement for the Company's IPO and was damaged thereby.   Lead Plaintiff first acquired loanDepot common stock on February 11, 2021, at which time the only shares of loanDepot common stock publicly available for purchase were shares registered under the Registration Statement.

28.     Additional Plaintiff Adam Doban, as set forth in Appendix B hereto, acquired loanDepot common stock pursuant and traceable to the Registration Statement

for the Company's IPO and was damaged thereby.  As of April 12, 2021, when Doban first purchased shares of loanDepot common stock, the only shares of such stock publicly available for purchase were shares registered under the Registration Statement.

### 2.    Securities Act Defendants

29.    Defendant loanDepot is a Delaware corporation with principal executive offices located at 26642 Towne Centre Drive, Foothill Ranch, California.  loanDepot's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "LDI."

30.    Defendant Anthony Hsieh ("Hsieh") is the founder of loanDepot and served as its Chief Executive Officer ("CEO") from the Company's inception until April 26, 2022, when he stepped down from that office.  At all relevant times, Hsieh has been a member of the Company's board of directors (the "Board"), first as Chairman and then, effective April 27, 2022, as Executive Chairman.  Hsieh signed the Registration Statement and authorized the filing of the Prospectus.

31.    Defendant Patrick Flanagan ("Flanagan") joined loanDepot in June 2017.  In December 2019, Flanagan was appointed as Chief Financial Officer ("CFO") of loanDepot.com, LLC ("LDLLC"), the Company's primary mortgage loan origination subsidiary.  In January 2021, Flanagan was appointed as CFO of loanDepot.  Flanagan signed the Registration Statement.

32.     Defendant Nicole Carrillo ("Carrillo") was, at all relevant times, the Executive Vice President and Chief Accounting Officer of the Company, and signed the Registration Statement.

33.     Defendant Andrew C. Dodson ("Dodson") was, at all relevant times, a director of the Company, and signed a consent form dated January 11, 2021, authorizing his name to be included in the Registration Statement as a director nominee of loanDepot.

34.     Defendant John C. Dorman ("Dorman") was, at all relevant times, a director of the Company, and signed a consent form dated January 11, 2021, authorizing his name to be included in the Registration Statement as a director nominee of loanDepot.

35.     Defendant Brian P. Golson ("Golson") was, at all relevant times, a director of the Company, and signed a consent form dated January 11, 2021, authorizing his name to be included in the Registration Statement as a director nominee of loanDepot.

36.     Defendant Dawn Lepore ("Lepore") was, at all relevant times, a director of the Company, and signed a consent form dated January 11, 2021, authorizing her name to be included in the Registration Statement as a director nominee of loanDepot.

37.     The Defendants named above in ¶¶ 30-36 above are collectively referred to herein as the "Individual Securities Act Defendants."

38.     loanDepot and the Individual Securities Act Defendants are collectively referred to herein as the "loanDepot Defendants."

39.     The following Defendants were underwriters of the IPO, and participated in roadshows, due diligence, solicitation of the purchase of loanDepot common stock by the public, and assistance in preparation of the Registration Statement:

      a.  Goldman Sachs & Co. LLC ("Goldman Sachs");

      b.  BofA Securities, Inc. ("BofA");

      c.  Credit Suisse Securities (USA) LLC ("Credit Suisse");

      d.  Morgan Stanley & Co. LLC ("Morgan Stanley");

      e.  Barclays Capital Inc. ("Barclays");

      f.  Citigroup Global Markets Inc. ("Citigroup");

      g.  Jefferies LLC ("Jefferies");

      h.  UBS Securities LLC ("UBS");

      i.  William Blair & Company, L.L.C. ("William Blair");

      j.  JMP Securities LLC ("JMP");

      k.  Piper Sandler & Co. ("Piper Sandler");

      l.  Raymond James & Associates, Inc. ("Raymond James");

      m. Nomura Securities International, Inc. ("Nomura"); and

      n.  AmeriVet Securities, Inc. ("AmeriVet");

40.     The Defendants named in the paragraph above are collectively referred to herein as the "Underwriter Defendants."

41.    The loanDepot Defendants and the Underwriter Defendants are collectively referred to herein as the "Defendants."

**B.    Relevant Non-Parties**

42.    FE-1[2] worked at loanDepot beginning several years before the IPO until early 2022 in several roles, including as a Vice President of Processing and as an Underwriting Manager.  In her position a Vice President of Processing, she liaised with loan officers and borrowers to prepare loan applications for the underwriting department. During her time in the underwriting department, she reviewed loan applications to verify the information contained therein, including by obtaining additional documentation from applicants and third parties.

43.    FE-2 was a Processing Assistant Manager at loanDepot from November 2020 until fall 2021.  She reported to David Vyse, Director of Processing, who in turn reported to Ronni Anchondo, Senior Vice President of Processing.

44.    FE-3 was a senior closer at loanDepot beginning several years before the IPO until August 2021.  She was assigned to the Company's office in Chandler, Arizona. She was responsible for preparing initial closing documents for borrowers, ensuring that all documents necessary for closings were issued in an accurate and timely manner, and

[2] Each person listed in this section is a former employee of the Company and is identified by an "FE-___" designation to preserve their privacy.  Female gendered pronouns are used for all FEs, regardless of their gender identity, to maintain their anonymity.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

reviewing signed documents for compliance with program guidelines. She had authority to authorize the funding of loans and also worked on post-closing issues that arose.

45.    FE-4 worked at loanDepot from early 2020 until after the IPO, first as a Director and then as a Vice President in the Processing department.  She was assigned to the Company's offices in Chandler, Arizona.   During her time at the Company, she reported to Senior Vice Presidents Ronni Anchondo and Andrew Porteck.

46.    FE-5 was a Senior Account Manager III, also known as a Direct Loan Processor III, at loanDepot from November 2020 until early 2022.  She reported to Sean McClinton, a Processing Vice President, and Sylvia "Syl" Scharnow, a Direct Mortgage Processing Manager.

47.    FE-6 worked at LoanDepot from August 2020 until early 2022, first as a loan processing assistant and then in training to be a loan processor. She was assigned to the Company's office in Foothill Ranch, California.  As a loan processing assistant, FE-6 supported loan processors by preparing and ordering title documents, communicating with insurance companies, conducting employment verification, and returning applicant calls and emails. She worked on homebuilding, FHA, conventional, and refinance loans.

48.    FE-7 was a licensed loan officer at loanDepot from early 2020 until March 2021, and was assigned to the Company's call center in Foothill Ranch, California.  She handled refinance loans, and she reported to Conrad Glassburger, another licensed loan officer.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

49.     FE-8 was a senior mortgage loan officer at the Company from 2019 until February 2021, and reported to Jess Smith, Vice President for Direct Operations.  She worked primarily on purchase loans handled by the Company's call centers.

50.     FE-9 was a senior account manager at loanDepot from mid-2020 until January 2021.  Her responsibilities included reviewing loans just prior to closing to identify missing documentation and to schedule closings.  She worked mostly on refinance loans.

51.     FE-10 was a post-closing coordinator at the Company from early 2020 until May 2021.  Her responsibilities included reviewing documents for funded loans to ensure that all required documents were present and, where needed, signed and notarized, which was a manual, not automated, process at the Company.  When documents were missing or not signed and notarized, FE-10 was responsible for contacting borrowers and/or their agents to remedy the issue.

**C.     LoanDepot Conducts an Initial Public Offering**

52.     On November 12, 2020, the Company filed a draft registration statement with preliminary prospectus on Form DRS with the SEC for a public offering of its Class A common stock.  On January 11, 2021, the Company filed a draft preliminary prospectus on Form S-1 with the SEC.  After exchanging correspondence with the SEC and amending the registration statement and preliminary prospectus in response to comments made by the SEC, loanDepot filed a final registration statement on February

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

9, 2021 (the "Registration Statement").   The SEC declared the Registration Statement effective on February 10, 2021.   On February 16, 2021, loanDepot filed a final prospectus with the SEC on Form 424B4 (the "Prospectus").   The Prospectus constitutes a part of the Registration Statement.   The Registration Statement, and the Prospectus that formed a part of the Registration Statement, were utilized in the IPO, which was completed on February 16, 2021.

53.    loanDepot initially announced the pricing of the initial public offering of 3,850,000 Class A shares at the public offering price of $14 per share.   In addition, loanDepot granted the Underwriter Defendants a thirty-day option to purchase up to 577,500 additional shares of the Company's common stock at the public offering price, less underwriting discounts and commissions.   As loanDepot announced on February 16, 2021, the Underwriter Defendants exercised this option.   Therefore, a total of 4,427,500 shares were sold to the public, via the Underwriter Defendants, in the IPO.

54.    Because all other shares of loanDepot's Class A common stock were subject to lock-up agreements or otherwise restricted from being publicly sold for at least 180 days following the date of the Prospectus, all shares trading in the secondary market during that period were registered under the Registration Statement and traded pursuant and/or traceable to the Registration Statement.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**D.      Substantive Allegations**

**1.      LoanDepot Embarks on an Undisclosed Scheme to Close Loans without Required Documentation, Violating a Host of Regulations, Laws, and Contractual Provisions**

*a) Exceptional Demand Stresses loanDepot's Loan Processing Capacity*

55.      In 2020, as loanDepot laid the groundwork for its initial public offering, historically low interest rates and other factors contributed to incredibly strong borrower demand for mortgages, both for new purchases and to refinance existing mortgages.  As mortgage lenders competed to service this demand, loanDepot boasted that its use of proprietary technologies—in particular the "mello" platform discussed above—gave it a critical advantage over its competitors in responding to this demand, enabling it to capture greater market share.   "Our fully-integrated, proprietary *mello*® technology platform has been developed over the last 10-plus years as a purpose-built, next-generation platform to streamline the entire mortgage lifecycle by providing a seamless and efficient experience for our customers, team members and partners."  This "seamless and efficient experience" was key to loanDepot's success, the Company claimed.

56.      However, the Company's technologies were not sophisticated or enough to keep pace with the market, and borrower demand overwhelmed the Company's capacity, particularity its underwriting and closing functions.

57.      The Company went on a hiring spree, nearly doubling its personnel expense from the first nine months of 2019 to the first nine months of 2020, which the Company

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

attributed to "increases in salaries and benefits expense due to the increase in headcount associated with the growth of our lending operation to support the increased loan origination volumes," as well as increased sales commissions tied to those increased origination volumes.  When FE-4 was hired in early 2020, she was told that her department would grow slowly.  Within a week of her starting at the Company, however, she was told "we want to hire 100 people within 90 days," an incredibly rapid rate.  Furthermore, she recalled that two other vice presidents were quickly growing their own teams at the same time.

58.    Many of these new hires, however, had little or no experience in the mortgage industry.  They required substantial training before beginning work, and their lack of experience created inefficiencies.  Both of these dynamics were exacerbated by the remote work and training arrangements that predominated at loanDepot due to the COVID-19 pandemic.  FE-1 recalled that: "We were so behind, and customers were so upset we couldn't close their loans on time."  FE-1 continued: "We had hired these individuals who, we had to teach them and train them remote. A lot of these people were not in the mortgage industry. Before, we had never hired people without experience. There was a lot of finger-pointing of hires we did because they weren't qualified to understand. They felt we were taking too long on these loans. A lot of the processors we hired didn't have knowledge or experience."  FE-4 similarly reported that many of the scores of people she hired at the Company's direction were inexperienced, and that

conducting remote training during the COVID-19 pandemic was difficult.  As a result, many hires received insufficient training for their positions.  FE-2 recalled that she encountered "very inexperienced processors," many of which, as discussed below, were "given authority to final approve those loans without any documentation, or asking any questions at all."

59.     Despite the massive hiring, the Company's lending operations were still failing to keep up with demand. Defendant Hsieh acknowledged this in an earnings call on February 18, 2021, conceding that "the brand is building faster than our ability to hire" and emphasizing that the Company was "still aggressively onboarding time-full employees."

60.     Numerous former employees corroborated Hsieh's concession that short-staffing remained an issue even after the IPO.  FE-9, who worked at loanDepot as a post-closing coordinator from early 2020 until January 2021, said that the Company was short-staffed even when she left, and that in fact that was why she decided to leave, with loanDepot "almost begging [her] to stay."  FE-10 had a similar experience; she left in May 2021 because of the short-staffing and long hours.  FE-8, who left the month of the IPO, also recalled that the Company required long hours of its employees because it did not hire enough staff to service the level of demand it took on, even to the point that employees were criticized for taking coffee and bathroom breaks.  According to FE-7, upper-level managers continuously tracked loan officers' number of calls, talk times,

missed calls, and average call length, and used this information to push employees. They were discouraged from taking bathroom breaks, and she was yelled at if she missed a call because she was using the restroom.  "If you didn't work 10- to 12-hour days, you'd be talked to," FE-7 recalled, adding that the short-staffing and pressure was especially difficult as management pushed for results in advance of the IPO.

> b) Hsieh Pressures the Operations Department to Loosen
> Underwriting Requirements and Close Loans More Quickly, Even
> Without Documentation

61.     These delays inhibited loanDepot's financial performance, frustrating senior management.  Beginning in August 2020, Hsieh repeatedly berated his Chief Operations Officer, Tammy Richards, for her insistence on following underwriting guidelines, including ensuring that required documentation was obtained and reviewed before closing loans, as he claimed that this was a principal cause of delays, according to a civil complaint filed by Ms. Richards against loanDepot, Hsieh, and other Company executives (the "Richards Complaint").  On or around August 20, 2020, as set forth in the Richards Complaint, Hsieh scolded Richards in a meeting of the entire executive team, blaming her for fealty to loanDepot's underwriting processes and for loanDepot's failure to keep pace with the loan origination volume of its largest competitor, Rocket Mortgage.

62.     The following week, during a production meeting held on or about August 20, 2020, which Ms. Richards attended, Hsieh instructed loanDepot staff to

"immediately close loans regardless of documentation!"  Hsieh further indicated that "sales should not stand by for this," suggesting that the sales department—the staff of which received commissions for closed loans—push the operations department to close all loans, despite the role of operations as a gatekeeper to ensure that the Company only underwrote and closed loans in compliance with applicable rules, regulations, and laws.

63.    Hsieh even caused the Company to conduct an investigation to determine if the Company's underwriting process was overly conservative, leading the Company to deny prospective mortgage borrowers who should have been approved for loans, according to the Richards Complaint.  Instead, as Richards alleged, the investigation showed no such thing.

64.    Following the meeting that occurred on or about August 20, 2020, Ms. Richards told Jeff Walsh, a Senior Executive Vice President and the Company's Chief Revenue Officer, that Hsieh's instruction to close loans without documentation was illegal.

65.    Indeed, Hsieh's plan would violate numerous laws, regulations, and contractual provisions governing loanDepot's loan origination and underwriting practices.

66.    *First*, the Mortgage Reform and Anti-Predatory Lending Act ("Mortgage Reform Act"), incorporated as Title XIV of the Dodd-Frank Act, requires that all mortgage originators "mak[e] a reasonable and good faith determination based on

*verified and documented* information that, at the time the loan is consummated, the consumer has a reasonable ability to repay the loan" (emphasis added).  Rather than rely on a prospective borrower's statements regarding the borrower's income, the statute requires that a mortgage originator examine the borrower's "Internal Revenue Service Form W-2, tax returns, payroll receipts, financial institution records, or other third-party documents that provide reasonably reliable evidence of the consumer's income or assets."

67.  *Second*, closing loans without documentation would endanger loanDepot's relationships with Fannie Mae, Freddie Mac, and Ginnie Mae, which, as previously noted, were and are absolutely essential to loanDepot.  The Registration Statement stated that loanDepot is "focused *almost exclusively* on originating agency-conforming and government mortgage loans, including FHA and VA loans, directly to qualified borrowers and selling these loans into the secondary market."  During the first quarter of 2021, for example, approximately 93% of the mortgage loans that loanDepot originated were sold to Fannie Mae or Freddie Mac or, in the case of mortgage-backed securities guaranteed by Ginnie Mae, are mortgage loans insured or guaranteed by the Federal Housing Administration or the Department of Veterans Affairs.

68.  The two GSEs and Ginnie Mae require that primary lenders with whom they do business comply with very detailed guidelines.  After all, Fannie Mae and Freddie Mac guaranteeing the payment of principal and interest on mortgages in MBS,

and Ginnie Mae guarantees the MBS themselves, ensuring that MBS investors do not experience disruption in cash flows from the securities.  The guidelines set forth by Fannie Mae, Freddie Mac, and Ginnie Mae cover essentially all aspects of a mortgage business.  With respect to the underwriting of mortgage loans, one overarching requirement is that information on a loan application must be corroborated by documentation.

69.    Fannie Mae imposes comprehensive and detailed guidelines setting forth the documentation that a mortgage lender must obtain for loans sold to that entity.  For instance, at a bare minimum, the lender must, in order to assess an applicant's income from employment, obtain the borrower's recent paystub and IRS W-2 forms covering the most recent one-year period.  In most circumstances, additional documentation of income is required.  Additionally, an appraisal report is de rigeur for the majority of mortgage loans, and may only be waived in specific limited circumstances.  Freddie Mac and Ginnie Mae impose substantially similar requirements.

70.    Compliance with these guidelines is mandatory.  In addition, any lender that does business with the GSEs or Ginnie Mae is required to develop and implement a quality control program that provides a structure to identify and remediate deficiencies in its loan manufacturing process.  A lender that fails to maintain an effective quality control program will be in breach of its contractual obligations with the relevant entity, which would have dire negative consequences for that lender, potentially including being

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

prohibited from selling mortgage loans to that entity, thus shutting the lender out of a massive portion of the secondary market.  Thus, a failure to establish and maintain quality control creates a material risk for mortgage lenders that contract with Fannie Mae, Freddie Mac, and/or Ginnie Mae.

71.   In addition, a lender's quality control plan must include, at a minimum, a process to confirm compliance with Fannie Mae and Freddie Mac requirements as well as with all applicable federal, state, and local laws and regulations.  The lender must identify any loans with a defect (i.e., loans not in compliance with the Fannie Mae guidelines or other related contractual terms and agreements), and the lender's management must receive, at least quarterly, a report of the results of the QC review process.

72.   *Third*, as loanDepot noted in the Registration Statement, "[w]hen the Company sells mortgage loans, it makes customary representations and warranties to the purchasers about various characteristics of each loan *such as the origination and underwriting guidelines*, including but not limited to the validity of the lien securing the loan, property eligibility, borrower credit, income and asset requirements, and compliance with applicable federal, state and local law" (emphasis added).  The origination and underwriting guidelines mandate that the Company obtain documentation verifying the information provided by the loan applicant.  If the Company has not done so, it constitutes a breach of the representations and warranties for the loan

at issue, and loanDepot's whole loan sale agreements generally require it to repurchase loans in that circumstance at the buyer's request. "Repurchased loans typically can only be resold at a steep discount to their repurchase price, if at all. They are also typically sold at a significant discount to the UPB," the Company acknowledged in the Registration Statement.

73.    *Fourth*, the Company depends on lines of credit that are secured by mortgage loans that comply with Fannie Mae, Freddie Mac, and/or Ginnie Mae guidelines for origination and underwriting of mortgage loans.  During 2019 and 2020, the Company issued notes a total of $1.7 billion in notes through securitization facilities that were secured by such.  The Company's failure to comply with those guidelines jeopardizes the Company's ability to access lines of credit to fund its operations.

74.    Thus, a failure to obtain documentation required by applicable guidelines created a significant risk of material adverse consequences for the Company, including: losses from being compelled to repurchase loans; penalties imposed by Fannie Mae, Freddie Mac, and/or Ginnie Mae; limitations on the Company's ability to transact with those entities, which could be catastrophic; limitations on its ability to access lines of credit; penalties imposed by government regulators; and the costs of addressing government investigations.

75.    Nevertheless, according to Richards, on or about October 28, 2020—less than four months before the IPO—Hsieh screamed at Richards that the Company needed

to "close all loans…close without credit reports…close without documentation…close all loans!"  Hsieh stated: "we are setting records every month and have grown staffing and capacity, but it's not enough!   Trust our borrowers and close loans without documents!  I already paid taxes on these loans and the loans are already shown as revenue!"  Richards refused, reiterating that credit reports and other documentation were necessary for each loan closing.

76.    Hsieh repeated his instructions the following day, despite Ms. Richards' prior observation that taking such a step would be illegal.

77.    Nevertheless, Tomo Yebisu, an Executive Vice President of Production, and a business partner of Hsieh's for over 20 years, began a cartoonish practice of rewarding high-performing sales agents with $100 bills to further incentivize staff to close loans even in the absence of documentation, as alleged by Richards.  As stated in the Richards Complaint, throughout the Company this was called the "Tomo Promo." Though Richards tried to dissuade Yebisu from this and from the pressure to close loans without necessary documentation, Yebisu responded that loanDepot was Hsieh's company, so they must follow his instructions.   After all, as two former Company employees, FE-1 and FE-5, recalled, Yebisu was Hsieh's "right hand man."

*c)  Hsieh Initiates Project Alpha and Project Beta*

78.    Furthermore, Hsieh approved a program to alleviate the pressure, ameliorate delays, and close more loans, which would bolster the Company's bottom line in the run-

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

up to the IPO: an initiative eventually known as "Project Alpha," later followed by "Project Beta."

79.    First, in early November, 2020, Hsieh removed a portion of loan processing from Ms. Richards' portfolio.   The "direct channel"—which connected directly to consumers—was put under the oversight of Mr. Yebisu.   Furthermore, Hsieh decreed that the operations team would report to the leadership of the sales department—creating a clear conflict between the incentives and functions of the two functions.

80.    On November 9, 2020, Jeff Walsh sent an email to Richards stating: "AH looking to fund some loans W/O docs."  A copy of this email was publicly filed with the Richards Complaint.

81.    This was Project Alpha, which was launched, at Defendant Hsieh's behest, in November, 2020.   Richards learned from other loanDepot employees that Project Alpha involved over 8,000 loans personally identified by Hsieh that were assigned to approximately two-hundred loan processors, also identified by Hsieh, that were authorized to close these loans without the necessary documentation.   If the processors were able to close the loans before the end of November, they would receive extra bonuses.

82.    FE-4 believed that the selection of loans was done by Hsieh or Yebisu; neither she nor her immediate supervisor had authority to make those selections. Moreover, from meetings and communications about Project Alpha, FE-4 understood

that the order to waive document requirements for Project Alpha loans came from above Tammy Richards—i.e., from Defendant Hsieh.

83.     Furthermore, because of the clear compliance and regulatory violations that Project Alpha involved, Hsieh directed the Company's Chief Credit Officer, Brian Rugg, not to audit the loans processed as part of Project Alpha. On November 18, 2020, Rugg emailed Richards a spreadsheet containing "the list of loans that we were asked to exclude from our PFQC review as a part of the AH BOT Initiative." "PFQC" refers to prefunding quality control, a critical function for mortgage borrowers to maintain compliance with GSE guidelines and regulations. "AH" refers to Anthony Hsieh. And "BOT" refers to "robot," a reference to the use of loanDepot's vaunted technological processes to identify the loans that would be processed in Project Alpha. Thus, rather than using mello to improve the customer interface or route borrowers to the most suitable personnel, it was used to identify loans that were candidates for improper processing. A copy of Mr. Rugg's email was filed publicly with the Richards Complaint. The "AH BOT initiative" become Project Alpha.

84.     According to FE-1, who was employed as an underwriter at loanDepot for years before the IPO, before becoming a Vice President of Processing, Project Alpha was intended to fast-track loan applications that met certain criteria, such as the applicant not being self-employed. FE-1 was told that the Company's mello software was used to identify loan applications that could be processed in Project Alpha.

-33-

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

85.    To keep pressure on the Project Alpha staff, complaints from applicants whose loans were part of the project were immediately escalated to Hsieh himself, according to FE-1.  The volume of these complaints was considerable.  FE-1 and her director had thirty complaints, many of them concerning delays in loan processing, and she learned that other departments had even more.  Given that there were at least eight vice presidents at the time, and additional directors, FE-1 suggested that Hsieh may have received hundreds of customer complaints around this time.  FE-1 knew that Hsieh was "very upset" because he expressed this at company meetings attended by FE-1, including in Company-wide "Town Hall" meetings.

86.    In meetings with Hsieh, Yebisu, and upper management that FE-1 attended, Hsieh—whom FE-1 described as "intimidating"—repeatedly pressed loanDepot personnel to close loans as quickly as possible.  FE-4 said that after Project Alpha began, she was in multiple meetings with Hsieh and Yebisu, though she had minimal contact with them prior to that. FE-4 reported that when questions were raised about the unusual processes for Project Alpha (and Project Beta, discussed further below), "we were basically told, 'Just move the loans. Stop questioning. Just move the loans.'"

87.    Hsieh did not stop with Project Alpha.  Rather, he initiated Project Beta with a new batch of loans, according to FE-2, who worked at loanDepot as a Processing Assistant Manager handling refinance loans from fall 2020 to fall 2021.

88.     Like Project Alpha, Project Beta was a large-scale, organized initiative.  As shown by internal loanDepot documentation, Project Beta involved at least twenty-two employees at the vice president or director level (including David Vyse, to whom to FE-2 reported; Andrew Porteck, to whom FE-4 reported; and Syl Scharnow, to whom FE-5 reported), over seventy processing managers, and several hundred loan processors. Loans totaling at least $4 billion, for properties in forty-six U.S. jurisdictions, were earmarked for Project Beta.

89.     FE-2 recalls that in December 2020, she attended a meeting where she and other processors were instructed regarding Project Beta, which was described as a project to close loans with "minimal documentation."  FE-5 also recalls that Project Beta was announced by Tomo Yebisu during a Company-wide Town Hall meeting December 2020 or early January 2021.  Yebisu described the program as one to close loans with minimal documentation, according to FE-5.

90.     Project Beta staff were instructed that the underwriting department would not be involved in Project Beta loans, according to FE-4.  They received a document titled "Project Beta Process Flow" listing criteria used to select loans for the project, and a checklist of documents required for such loans, which was far more minimal than the requirements imposed by Fannie Mae and Freddie Mac, reported FE-4.  For instance, the checklist did not include Form W-2 documents, nor did it ask for multiple months of bank statements as the GSEs require, said FE-4.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

91.     As with Project Alpha spreadsheets were circulated identifying the loans that were to be fast-tracked.  Loan processors of a certain seniority—at the level of Direct Loan Processor II or Direct Loan Processor III—were authorized to close these loans even in the absence of proper documentation.  The message was explicit: "We were told to final approve the loans without any documentation at all from the borrower," according to   Indeed, "It was no income, no asset verification, nothing from the borrower as far as letters of explanation, no credit supplements. It was pretty bare bones loans," according to FE-4.  When information in the loan application raised questions, or created discrepancies, the matter was not for Project Beta loans—the loan process pushed forward to closing as quickly as possible, according to FE-2.  For example, Project Beta was intended to only cover owner-occupied properties.  Normally, if an application for a mortgage on an owner-occupied property included a pay stub directed to another address, the apparent discrepancy was pursued, but this was not done in Project Beta because the assigned staff were directed to prioritize speed.

92.     The progress of Project Beta was tracked, and updated spreadsheets indicating which loans had closed and which were still open were sent out to the staff assigned to the project, FE-2 recalled.

93.     For Project Beta, FE-2 was given instructions by Sean McClinton, a Processing Vice President, who she understood received this directive from more senior management.  Moreover, according to FE-2, McClinton did not generally have authority

to waive or override documentation requirements, so the directive must have come from higher up in the Company.  FE-2 recalls that she and McClinton received emails from another individual with the last name Reid that stated, essentially, "Here's [sic] your Beta loans. Just sign off on them and get them to closing.'"

94.     FE-5, who also reported to McClinton, as well as to Syl Scharnow, even asked both of them: "are we going to get in trouble for this? It sounds illegal."

95.     FE-2 attended meetings where Project Beta was discussed with Anthony Hsieh, and she recalls that senior management stated that the purpose of Project Beta was "to push loans through as fast as possible just to close as many loans as we could" because obtaining documentation from applicants "takes time."

96.     FE-3reported that improperly closing loans without necessary documentation was not limited to Project Alpha and Project Beta.  "We were told just to push things through … It was 'Just fund it' – especially at the end of the month," FE-3 recalled. When she pushed back, she was told "It doesn't matter. Just fund it."  For example, "LoanDepot wanted me to fund a file without final inspection – and I had never heard that anywhere," FE-3 said.  Any time that she was instructed to approve a loan for funding without obtaining necessary documentation, she indicated in the notes for the loan file that she had been told by her supervisor to do so.  However, FE-3 was told that the directive came from a higher level of the Company.

97.     As with Project Alpha, staff assigned to Project Beta were provided extra incentives to close loans in the project.  FE-4 recalled Tomo Yebisu saying that Project Beta staff would receive bonuses of an additional $50 per loan. Yebisu said, "'we're going to do these loans, we've got this all set up. You guys are just going to get to push them through," adding, "you're going to make even more money with bonuses.'"

98.     The existence of Project Alpha was first revealed on September 21, 2021, when Richards filed a complaint against the Company, Hsieh, and others.  According to FE-4, the Company suddenly began to insist on proper underwriting processes in approximately January 2022.   The underwriting department circulated new, more stringent checklists for loan closings, and staff that previously had authority to approve loans found it stripped from them.

99.     Unsurprisingly, the Company's push to close loans with obtaining documentation to verify the information it received from loan applicants caused problems in the securitization and sale of those loans.  Ironically, FE-1 was tasked with reviewing loans that investors claimed loanDepot needed to repurchase due to a lack of required documentation or other deficiencies.  The majority of the loans being returned by investors were Alpha loans, which was easy to discern because, in loanDepot's software, all Alpha loans were clearly indicated as such.  FE-2 stated: "It's shocking to me that Freddie and Fannie aren't looking into these loans and saying, 'Where is the paperwork?'"

100.   When FE-1 reviewed the files for the loans that investors sought to have loanDepot repurchase, she found many without any bank statements or documentation of assets.  She also discovered numerous Project Alpha loans to self-employed borrowers, even though they were supposedly excluded from Project Alpha. FE-1's responsibility was to contact borrowers and obtain additional information and documents, which frustrated borrowers given that the loan had already closed.

101.   FE-10 was also responsible for tracking down missing documentation for loans that had already been funded. In one case, a vice president tasked her with tracking down missing tax returns, which are essential documents to verify borrower income and are required for loans sold to GSEs.  Nevertheless, she and several other employees were provided with an Excel spreadsheet listing loans and assigned to track down missing 2019 tax returns for those loans.  However, when contacting borrowers and/or their agents to collect missing documents after the funding of the loan, she was only able to obtain such documents approximately half of the time, because the borrower had little incentive to spend time fixing loanDepot's oversights after their loan was already funded.

102.   If loanDepot was unable to obtain missing documentation, it would be liable to purchase the loan from the MBS investor, and repurchased loans are nearly impossible to sell again, even at a fraction of the loan's unpaid principal balance.

### 2. LoanDepot's Improper Collection of Double Daily Interest From Refinance Borrowers

103.   As alleged in the Richards Complaint, from at least 2016 until at least December 2019, loanDepot, through its subsidiary Closing USA, LLC ("CUSA"), was improperly double-charging daily interest to refinance borrowers as a result of inaccuracies in closing disclosure documents.   During that period, CUSA and loanDepot's closing disclosure documents for refinance loans erroneously listed as the "closing date" the date that the loan documents were printed, rather than the date on which the original loan was actually paid.  As a result, CUSA and loanDepot improperly treated the original loan and the new refinance loan as both being outstanding for the period of time between those two dates, and accordingly charged refinance borrowers interest on both loans during that period.  This improper practice (the "Double Interest Charging") violated the terms of the refinance agreement with each affected borrower, the disclosure documents themselves, and state consumer protection and other laws applicable to loanDepot.

104.   In November 2019, Tammy Richards, the Company's then-Chief Operating Officer, discovered the Double Interest Charging problem and shortly thereafter reported the matter to both Hsieh and Peter MacDonald, loanDepot's General Counsel.  Instead of acting to remedy the matter, however, Hsieh decided that loanDepot would selectively return improperly collected interest only to a subset of the affected borrowers. Specifically, Richards was informed, Hsieh decided that loanDepot would only return

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

the improperly collected interest to borrowers in states that had attorneys general that loanDepot believed were most likely to take action concerning this systematic issue.  As to the rest of the affected borrowers, Hsieh decided that loanDepot would retain the money it had wrongfully collected, boosting the Company's financial condition.

105.   Neither the existence of the multi-year wrongful practice of Double Interest Charging, nor the decision to retain wrongfully collected interest, was disclosed in the Registration Statement.  Instead, the Registration Statement reported financial results inflated by the improper double interest collection and touted the Company's compliance processes and internal controls over financial reporting.

106.   Rather than disclosing that loanDepot wrongfully collected double per diem interest from refinance borrowers from 2016 through at least December 2019, or that loanDepot had specifically determined to retain such monies for a subset of affected borrowers, the Registration Statement touted the Company's compliance programs, *including with respect to per diem interest* charges.

107.   The Registration Statement disclosed that during the fourth quarter of 2019, an increase in mortgage originations and resulting title orders and loan settlements created "personnel and operational pressures" that resulted in longer loan settlement timelines and "an increase in the number of days between receipt of funds from the originating lender and the disbursement of those funds to the payoffs on the loan transaction."   In response, "[a] review was initiated in order to refund affected

consumers any overage in per diem charges due to the delay based on loan program and property state requirements," with "all refunds . . . to be remitted to affected consumers during 2020."

108.   Despite addressing this separate compliance matter concerning per diem interest charges, the Registration Statement entirely omitted to disclose the Double Interest Charging or the Company's decision concerning how to address the Double Interest Charging.

109.   Furthermore, the Registration Statement reported financial results for 2019 and the first nine months of 2020 that included interest income purportedly "earned" for the period loans are "held," even though the double interest collected from affected refinance borrowers was not properly "earned" and—because the practice was based on an improper treatment of refinance loan closing dates—was collected on loans before they closed and thus before they were "held" by the Company.

110.   As a result, the Registration Statement materially misrepresented the Company's practices with respect to interest income and materially overstated the Company's interest income, origination income, and cash.

111.   The Company's years-long practice of improperly collecting double per diem interest from refinance borrowers was necessarily unsustainable because of the legal, regulatory, reputational, and financial risks that it created.   These risks were heightened because of the increased scrutiny loanDepot would receive from analysts,

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

investors, and auditors once it went public.  Therefore, the Company was compelled to end the practice.  Unable to bolster its financial performance with improper interest collection, the Company reported declining interest income, relative to refinance volumes, following the IPO.

112.   The IPO documents represented that the Company earned $127.57 million of interest income on loans held for sale in 2019, when refinance loans accounted for 59.2% of the Company's total loan origination volume of over $45 billion.  Following the IPO, when the Company announced full-year 2020 results, the rate of interest income to loan volume had fallen by more than half, even as refinance loans grew to nearly 72% of the Company's total loan origination volume of $100 billion.[3]  Without collecting improper double daily interest from its refinance customers, the Company has proved unable to approach the rate of interest income relative to total or refinance loan volume that it represented in the IPO documents.

### 3. LoanDepot Experiences Declining Gain on Sale Margins as the IPO Approaches

113.   As noted above, lenders in the primary mortgage market, like loanDepot, earn as revenue the difference between the interest rate charged to borrowers and the lower rate paid to the secondary market buyer when mortgage loans are sold.  A critical measurement of this is the "gain on sale margin," which loanDepot's 2020 annual report

---

[3] At the time of the IPO, the Company stated that it had not yet completed its financial closing procedures and external audit for the year ended December 31, 2020.  Therefore, though it reported

-43-

defined as "the sum of gain on sale and origination of loans, net and origination income, net, divided by total loan originations for the period."  The ability of a primary mortgage lender to achieve a high gain on sale margin is dependent on several factors, including the "primary-secondary spread," which is the difference between mortgage rates for borrowers, on one hand, and yields on newly issued agency MBS, on the other hand.

114.   Though the rate for a thirty-year mortgage—the most common mortgage term in the U.S.—generally follows long-term Treasury yields, the difference between them is not constant, which is largely a result of the division between the primary and secondary mortgage markets.  In early 2020, when the Federal Reserve slashed interest rates to mitigate negative economic repercussions of the COVID-19 pandemic, mortgage rates also dropped, but to a lesser degree.  Borrower demand for mortgage loans—either new purchases or existing homeowners seeking refinance loans to take advantage of lower mortgage rates—remained high.  The demand challenged the capacity of the primary mortgage market to process loans.  In this environment, primary mortgage firms felt little incentive to compete with each other by offering lower rates to borrowers.  As a result, the primary-secondary spread remained high, and primary mortgage lenders, including loanDepot, reaped exceptional profits.

115.   Indeed, the Registration Statement reported, for the nine months ended September 30, 2020, loanDepot's total gain on sale margin was 4.8%, a 56% increase

---

certain unaudited financial data for the full year of 2020, the most up-to-date complete annual results

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

over the first nine months of 2019, when the Company's gain on sale margin was 3.06%.

LoanDepot's gain on sale margin for fiscal 2019 as a whole was even lower, at 2.81%.

116.   A key question for investors was: how long could the Company sustain higher gain on sale margins?   The Registration Statement directly addressed this question, repeatedly stating that the Company's gain on sale margins could decline *in the future* based on market conditions, particularly prevailing interest rates and resulting borrower demand.  For instance, it stated:

> We generate a sizeable portion of our revenues from loans we make to clients that are used to refinance existing mortgage loans. Generally, the refinance market experiences significant fluctuations. As interest rates rise, refinancing volumes generally decrease as fewer consumers are incentivized to refinance their mortgages. This could adversely affect our revenues or require us to increase marketing expenditures in an attempt to maintain refinancing related origination volumes. Higher interest rates may also reduce demand for purchase mortgage loans as home ownership becomes more expensive and could also reduce demand for our home equity loans. *Market demand in 2020 was driven by a prolonged period of historically low interest rates. This demand contributed to gain on sale margins reaching levels that the Company does not believe will be sustained in future years and could result in decreases in revenue.* Decreases in interest rates can also potentially adversely affect our business as the stream of servicing fees and correspondingly, the value of servicing rights, decreases as interest rates decrease.

117.   At the time this statement was made, however, the Company's gain on sale margins had *already* starkly declined for both purchase and refinancing loans.  Former loanDepot employees confirmed that borrower demand at the Company began to level off well before the IPO.  According to FE-7, the Company began to see a downturn in

---

disclosed in the Registration Statement were those for the year ended December 31, 2019.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

demand, specifically for refinance loans, in December 2020, who said "it was just a thinner market, less opportunities than usual."  Another former employee, FE-6, who said that the Company pushed hard to close loans in a "last-ditch effort" before the IPO, said that workloads and hiring began to ease in January 2021, prior to the IPO, and the slowdown continued throughout that quarter.

118.   loanDepot acknowledged later that its gain on sale margins began falling in late 2020, weeks before the IPO.  On February 18, 2021—eight days after the effective date of the Registration Statement—the Company reported that its gain on sale margin or the full year of 2020 was only 3.38%, a nearly 30% decline from the 4.8% gain on sale margin touted in the Registration Statement, which the Company described as a "return[] to a more normalized level."  The drastic decline in gain on sale margin in the fourth quarter of 2020 was, the Company admitted, a primary driver of a nearly 25% decline in net income versus the prior quarter.  After opening at the price of $27.87 on February 18, 2021, loanDepot's stock price fell to $25.77 at the close of that trading day and continued falling for several consecutive trading days thereafter, closing at $19.04 on February 23, 2021.

119.   The declining margins the Company was experiencing at the time of the IPO were further revealed on May 3, 2021, when loanDepot issued a press release announcing financial results for the first quarter of 2021 and held an earnings call with analysts.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

120.   In the May 3, 2021 press release, loanDepot reported that its gain on sale margin or the first quarter of 2021 had fallen to 2.71%.  The press release stated that "[i]nterest rates began to rise in late Q1, and there has been a corresponding reduction in market opportunities and gain on sale margins as a result.  While we anticipated the rise in interest rates, the shift began earlier in 2021 than generally expected.  Competitive pricing strategy pressure from other market participants also had a market-wide impact on margins."

121.   In response to this news, loanDepot's stock price fell precipitously.  From a closing price the prior trading day of $19.84, the price of loanDepot's common stock fell over 3.9% to $19.06 at the close of trading on May 3, 2021, and continued falling for several consecutive days, to a price of $12.10 at the close of trading on May 13, 2021—a decline of over 39% from the closing price on the trading day preceding the May 3, 2021 press release.

## E.   Material Misstatements in the Registration Statement

### 1.   The Registration Statement Misleads Investors Concerning the Company's Loan Closing Practices and the Basis of the Company's Loan Origination Volumes and Market Share Capture

122.   Despite the material significance of Project Alpha and Project Beta, their contribution to the Company's financial performance, and the material risks they entailed, the Company did not disclose their existence in the Registration Statement.  To the contrary, the Registration Statement falsely attributed the Company's performance,

including its loan origination volume and market share, to its mello technology platform. However, the Company's financial condition was based on its decision to systematically disregard applicable loan origination and underwriting requirements, which created material risks for the Company, including but not limited to its essential relationships with Fannie Mae, Freddie Mac, and Ginnie Mae.   The Registration Statement misled investors concerning these material facts.

123.   The Registration Statement stated that "[w]e originate and sell Agency-eligible and non-Agency-eligible residential mortgage loans. *Agency-eligible loans are underwritten in accordance with guidelines defined by the Agencies*, as well as additional requirements in some cases, designed to predict a borrower's ability and willingness to repay" (emphasis added).[4]

124.   This statement was materially false and misleading because loanDepot systematically underwrote and closed thousands of mortgage loans not in accordance with guidelines defined by the "Agencies," in particular as part of Project Alpha and Project Beta.

125.   Regarding the necessity of compliance with underwriting guidelines that Project Alpha and Project Beta violated, the Registration Statement stated that "[w]e are required to follow specific guidelines that impact the way that we originate and service

---

[4] In the Registration Statement, "Agencies" referred to Fannie Mae, Freddie Mac, the Federal Housing Administration, the Federal Housing Finance Agency, and "certain other federal government authorities."

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Agency loans, including guidelines with respect to: . . . our staffing levels and other origination and servicing practices; . . . [and] internal controls such as data privacy and security, compliance, quality control and internal audit."

126.   This statement was misleading because it omitted to disclose that the Company had chosen to originate and close tens of thousands of loans without documentation, in violation of the guidelines applicable to the way that it originates Agency loans, and in violation of internal controls such as underwriting, quality control, and internal audit because it excluded Project Alpha loans from such processes.

127.   The Registration Statement further stated that:

> During the Obama administration, the federal government initiated a number of actions against mortgage loan lenders and servicers alleging violations of FIRREA and the FCA. Some of the actions against lenders alleged that the lenders sold defective loans to Fannie Mae and Freddie Mac, while representing that the loans complied with the GSE's underwriting guidelines. The federal government has also brought actions against lenders asserting that they submitted claims for FHA-insured loans that the lender falsely certified to HUD met FHA underwriting requirements that resulted in FHA paying out millions of dollars in insurance claims to cover the defaulted loans. See "Business—Supervision and regulation—Supervision and enforcement" and the risk factor captioned "—We are subject to regulatory investigations and inquiries and may incur fines, penalties and increased costs that could negatively impact our future liquidity, financial position and results of operations or damage our reputation." Because these actions carry the possibility for treble damages, many have resulted in settlements totaling in the hundreds of millions of dollars, as well as required lenders and servicers to make significant changes in their practices.

128.   This statement was false and misleading because it failed to disclose that, despite the risk of triggering regulatory investigations, civil actions, fines, and other

repercussions, loanDepot was nevertheless selling defective loans to Fannie Mae and Freddie Mac, while representing that the loans complied with the GSEs' underwriting guidelines.

129.   The Registration Statement further stated that:

While our contracts vary, we provide representations and warranties to purchasers and insurers of the mortgage loans sold that typically are in place for the life of the loan. In the event of a breach of these representations and warranties, we may be required to repurchase a mortgage loan or indemnify the purchaser or insurer for losses, and any subsequent loss on the mortgage loan may be borne by us. The representations and warranties require adherence to applicable origination and underwriting guidelines, including but not limited to the validity of the lien securing the loan, property eligibility, borrower credit, income and asset requirements and compliance with applicable federal, state and local law.

130.   This statement was false and misleading because it failed to disclose that, despite the risk that loanDepot might be required to repurchase a mortgage loan or indemnify purchasers for non-conforming loans, the Company nevertheless had chosen, by pursuing Project Alpha and Project Beta, to breach the representations and warranties it provided to purchasers and insurers of the mortgage loans that it sold.

131.   The Registration Statement boasted that the Company "[a]chieved record monthly origination volume of $11.8 billion in November 2020." This statement emphasizing the Company's loan origination volume in November 2020 was materially false and misleading because the Registration Statement failed to disclose that November 2020 was the exact month in which loanDepot launched Project Alpha, which

incentivized personnel to close as many loans as possible, even in the absence of documentation, before that month ended.

132.   In addition, the Registration Statement was materially misleading by omitting to disclose, as required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), material facts, trends, and risks pertaining to the Company's systematic violation of regulations, laws, and contractual provisions governing mortgage loan underwriting and closing.

133.   Item 303 requires a registered securities issuer, such as loanDepot, to disclose events, uncertainties, and trends that are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.  *See* Item 303 of SEC Reg. S-K, 17 C.F.R. §229.303; *see also* 17 C.F.R. §229.303(a)(3)(ii) (requiring registrants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations.").

134.   The Registration Statement, while reporting unaudited financial results for 2020 that reflected loans improperly underwritten and closed in connection with Project Alpha and Project Beta, failed to disclose anything regarding these projects.  Project Alpha and Project Beta, because they created a substantial risk of material adverse consequences for the Company, were unsustainable, especially given the increased scrutiny the Company would experience as a public company.  Their cessation would be

expected to cause a decline in the Company's origination volumes, income, and revenues. Thus, each constituted a known trend and uncertainty that reasonably would be expected to have a material unfavorable impact on loanDepot's future revenues or income from continuing operations. Furthermore, because the Registration Statement provided financial information that reflected Project Alpha and Project Beta, it was reasonably like that the reported financial information would not be indicative of future financial results. Thus, loanDepot's push to close loans without necessary documentation was required to have been disclosed in the Registration Statement.

135. Because of this materially misleading omission, the basis of the financial performance reported in the Registration Statement, and the risks created by Project Alpha and Project Beta, remained concealed from investors.

## 2. The Registration Statement Misleads Investors Concerning LoanDepot's Multi-Year Wrongful Collection of Doubled Interest from Refinance Borrowers

136. Without disclosing the Double Interest Charging, the Registration Statement addressed a separate and distinct compliance matter concerning per diem interest charges, stating:

*Compliance Matters*

During the fourth quarter of 2019, an increase in mortgage originations resulted in an increase in title orders and loan settlements creating personnel and operational pressures within the Company. The Company increased staffing, adjusted schedules and enhanced processes, but still experienced constraints in order to meet settlement timelines. Specifically, there was an increase in the number of days

-52-
AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

between receipt of funds from the originating lender and the disbursement of those funds to the payoffs on the loan transaction. *A review was initiated in order to refund affected consumers any overage in per diem charges due to the delay based on loan program and property state requirements. The review is in the final stages and all refunds are to be remitted to affected consumers during 2020.* As a result of this event and in order to prevent recurrence, the Company has decreased the number of states in which they accept orders in order to manage pipelines and routinely review key performance indicators along with pipeline estimates from their customers.

(Emphasis added.)

137. This statement was materially misleading because, despite addressing compliance violations with respect to per diem interest charges and the Company's actions to remediate such violations, the Registration Statement did not disclose the Double Interest Charging, the Company's decision to return some but not all of the improperly-collected interest to borrowers, or the legal, regulatory, reputational, and financial risks created by these concealed facts, including the risk that the Company's interest income and net interest income (or expense) would decline (or increase, in the case of net interest expense) post-IPO as a result of ceasing the Double Interest Charging.

138. The Registration Statement reported, for 2019, interest income of $127,569,000 and net interest expense of $2,775,000, and, for the first nine months of 2019, corresponding figures of $86,493,000 and $3,057,000.

139. These statements were misleading because, by failing to disclose that these financial results depended on the Double Interest Charging, the Company concealed the

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

risk that its performance with respect to interest income and net interest income (or expense) would suffer following the IPO because it could not continue the Double Interest Charging.

140.   The Registration Statement stated that "[n]et interest income reflects interest *earned* on LHFS offset by interest expense on amounts borrowed under Warehouse Lines to finance such loans until sold," and that "Origination revenue is comprised of fee income earned at origination of a loan, interest income *earned* for the period the loans are *held*, and gain on sale on loans upon disposition of the loan" (emphasis added).

141.   These statements were false and misleading because loanDepot's Double Interest Charging involved collecting interest that was not "earned" because each affected refinancing loan had not yet closed.  Furthermore, the Double Interest Charging involved collecting interest that was not related to "the period the loans are held" because, until a loan is closed, it is not "held" by loanDepot.

142.   Following the IPO, the Company's interest income fell substantially, contributing to a decline in loanDepot's stock price to fall, injuring investors that purchased shares pursuant or traceable to the Registration Statement.

### 3.   The Registration Statement Misleads Investors Concerning LoanDepot's Gain on Sale Margins

143.   The Registration Statement made several substantially similar statements concerning gain on sale margins.  On pages 13 and 105, it stated that "[m]arket demand

in 2020 was driven by a prolonged period of historically low interest rates. This demand contributed to gain on sale margins reaching levels that the Company does not believe will be sustained in *future years* and *could* result in decreases in revenue."

144.    Similarly, the Registration Statement also stated:

We generate a sizeable portion of our revenues from loans we make to clients that are used to refinance existing mortgage loans. Generally, the refinance market experiences significant fluctuations. As interest rates rise, refinancing volumes generally decrease as fewer consumers are incentivized to refinance their mortgages. This could adversely affect our revenues or require us to increase marketing expenditures in an attempt to maintain refinancing related origination volumes. Higher interest rates may also reduce demand for purchase mortgage loans as home ownership becomes more expensive and could also reduce demand for our home equity loans. *Market demand in 2020 was driven by a prolonged period of historically low interest rates. This demand contributed to gain on sale margins reaching levels that the Company does not believe will be sustained in **future years** and **could** result in decreases in revenue*. Decreases in interest rates can also potentially adversely affect our business as the stream of servicing fees and correspondingly, the value of servicing rights, decreases as interest rates decrease.

145.    The Registration Statement was materially misleading in stating that gain on sale margins in 2020 "reach[ed] levels that the Company does not believe will be sustained in future years and could result in decreases in revenue" because, at the time of the IPO, loanDepot had already experienced a material and worsening decline in gain on sale margins, and in the borrower demand that sustained such margins, with negative repercussions for the Company's performance and growth.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

146.   In addition, the Registration Statement violated Item 303 of Regulation S-K by failing to disclose the trend of worsening gain on sale margins that the Company began experiencing months prior to the effective date of the Registration Statement.

147.   The Company admitted, a mere eight days after the IPO, that its gain on sale margins started to decline as early as the fourth quarter of 2020, which closed a full six weeks prior to the IPO.  That material adverse trend in gain on sale margins was reasonably likely to cause loanDepot's financial information not to be indicative of future operating results, and to have a material unfavorable impact on the Company's revenues or income from continuing operations, and thus loanDepot was obligated to have disclosed it under Item 303.

**F.**   **LoanDepot's Stock Price Declines Following the IPO**

148.   Following the IPO, the false and misleading nature of Defendants' misstatements gradually became clear to investors, and the price of loanDepot's common stock fell far below the IPO price.  On September 3, 2021, when the first complaint in this consolidated action was filed, loanDepot's stock price was $8 per share at the start of trading and $7.91 at market close.  On the date of this complaint, the Company's stock price was $1.42 per share when the market opened.

**G.**   **Securities Act Counts**

**COUNT I**

**(Violations of Section 11 of the Securities Act Against All Defendants)**

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

149.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all Defendants, on behalf of Plaintiffs and all Class members who purchased or otherwise acquired loanDepot common stock pursuant or traceable to the Registration Statement.  This Count does not sound in fraud.  With respect to this Count, Plaintiffs do not claim that any of the Defendants acted with scienter or fraudulent intent, and Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this Count.  This Count is based on strict liability.

150.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.   For purposes of this Count, Plaintiffs do not reallege or reallege the allegations in ¶ 7.

151.   At all times, including when it was declared effective, the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

152.   loanDepot is the registrant for the IPO.  Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

153.   As issuer of the shares, loanDepot is strictly liable to Plaintiffs and the Class for the misstatements and omissions.

154.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

155.   By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

156.   Plaintiffs acquired loanDepot shares pursuant and/or traceable to the Registration Statement for the IPO.

157.   Plaintiffs and the Class have sustained damages.   The value of loanDepot common stock has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

## (Violations of Section 15 of the Securities Act Against the Individual Securities Act Defendants)

158.   This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77k, against the Individual Securities Act Defendants, on behalf of Plaintiffs and all Class members who purchased or otherwise acquired loanDepot common stock pursuant or traceable to the Registration Statement.   This Count does not sound in fraud. With respect to this Count, Plaintiffs do not claim that any of the Defendants acted with

scienter or fraudulent intent, and Plaintiffs expressly disclaim any allegations of scienter or fraudulent intent in this Count.  This Count is based on strict liability.

159.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.   For purposes of this Count, Plaintiffs do not reallege or reallege the allegations in ¶ 7.

160.   The Individual Securities Act Defendants, by virtue of their offices, authority, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of loanDepot within the meaning of Section 15 of the Securities Act.  The Individual Securities Act Defendants had the power and influence and exercised the same to cause loanDepot to engage in the acts alleged herein.

161.   The Individual Securities Act Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

162.   By virtue of the conduct alleged herein, the Individual Securities Act Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

## V.   EXCHANGE ACT ALLEGATIONS

### A.   Exchange Act Parties

#### 1.   Plaintiffs

163.   Lead Plaintiff Arthur Gary Lafrano, as set forth in Appendix A hereto, acquired loanDepot common stock at artificially inflated prices during the Class Period and was damaged thereby.

164.   Additional Plaintiff Adam Doban, as set forth in Appendix B hereto, acquired loanDepot common stock at artificially inflated prices during the Class Period and was damaged thereby.

#### 2.   Exchange Act Defendants

165.   Defendant loanDepot is described in ¶ 29, above.

166.   Defendant Hsieh is described in ¶ 30, above.  Hsieh signed Company's annual report on Form 10-K for 2020 as well as the quarterly reports on Form 10-Q for the first and second quarters of 2021, and certified that they accurately represented the Company's financial condition and did not contain any material misstatements.

167.   Defendant Flanagan described in ¶ 31, above.  Flanagan signed Company's annual report on Form 10-K for 2020 as well as the quarterly reports on Form 10-Q for the first and second quarters of 2021, and certified that they accurately represented the Company's financial condition and did not contain any material misstatements.

168.   Defendants Hsieh and Flanagan are referred to herein as the "Individual Exchange Act Defendants."  With loanDepot, they are the "Exchange Act Defendants."

**B.** **Materially False and Misleading Statements from Which the Exchange Act Claims Arise**

169.   Plaintiffs repeat and reallege the allegations set forth in section IV.D.1. above as if fully set forth herein.

**1.** **Misstatements Regarding Ms. Richards' Demand Letter and the Allegations Therein**

170.   The Company's annual report on Form 10-K for 2020, and its quarterly reports on Form 10-Q for the first and second quarters of 2021, disclosed that on December 24, 2020, the Company received a demand letter from one of the senior members of its operations team alleging, among other things, loan origination noncompliance, and stated that the Company's management does not believe these allegations have merit.  Each of these filings contained substantially similar language.

171.   The annual report on Form 10-K for 2020, filed on March 16, 2021 (and amended in other respects on March 26 and March 29, 2021) (the "2020 10-K"), stated:

> Recently, on December 24, 2020, we received a demand letter from one of the senior members of our operations team asserting, among other things, allegations of loan origination noncompliance and various employment related claims, including allegations of a hostile work environment and gender discrimination, with unspecified damages. We are conducting an investigation into the claims and our investigation is not complete. While the Company's management does not believe these allegations have merit, should the executive file a formal lawsuit against us, it could result in substantial costs and a diversion of our management's attention and resources.

172.   The quarterly report on Form 10-Q for the first quarter of 2021 (the "1Q21 10-Q"), filed on May 10, 2021, stated:

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

On December 24, 2020, the Company received a demand letter from one of the senior members of its operations team alleging, among other things, loan origination noncompliance and various employment related claims, including hostile work environment and gender discrimination, with unspecified damages. The Company's investigation of the claims is ongoing. The parties have agreed to participate in pre-litigation mediation, which the Company anticipates will take place in late-May 2021. While the Company's management does not believe these allegations have merit, should the executive file a formal lawsuit against the Company, it could result in substantial costs and a diversion of management's attention and resources.

173.   The quarterly report on Form 10-Q for the second quarter of 2021 (the "2Q21 10-Q"), filed on August 11, 2021, stated:

On December 24, 2020, the Company received a demand letter from one of the senior members of its operations team alleging, among other things, loan origination noncompliance and various employment related claims, including hostile work environment and gender discrimination, with unspecified damages. The executive has since resigned her position with the Company. The parties participated in pre-litigation mediation in May 2021. The parties did not resolve the matter at mediation, but negotiations are ongoing. While the Company's management does not believe these allegations have merit, should the executive file a formal lawsuit against the Company, it could result in substantial costs and a diversion of management's attention and resources.

174.   These statements were false and misleading because the phrase "loan origination noncompliance" materially downplayed Ms. Richards' allegations of a systematic initiative involving loanDepot's most senior management to violate laws, regulations, and contractual provisions governing the Company's loan origination and underwriting practices, creating substantial risks of material adverse consequences, none of which was disclosed by the Company.  Because the Exchange Act Defendants

-62-

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

chose to address Ms. Richards' allegations, they were obligated to disclose their scope and significance.  By not doing so, the statements in the three above paragraphs were materially false and misleading.

### 2.    Misstatements Regarding the Company's Loan Origination and Underwriting Practices

175.   The 2020 10-K stated that "[w]e originate and sell Agency-eligible and non-Agency-eligible residential mortgage loans. *Agency-eligible loans are underwritten in accordance with guidelines defined by the Agencies*, as well as additional requirements in some cases, designed to predict a borrower's ability and willingness to repay."

176.   This statement was materially false and misleading because loanDepot systematically underwrote and closed thousands of mortgage loans not in accordance with guidelines defined by the "Agencies," in particular as part of Project Alpha and Project Beta.

177.   Each of the 2020 10-K, the 1Q21 10-Q, and the 2Q21 10-Q stated that:

While our contracts vary, we provide representations and warranties to purchasers and insurers of the mortgage loans sold that typically are in place for the life of the loan. In the event of a breach of these representations and warranties, we may be required to repurchase a mortgage loan or indemnify the purchaser or insurer for losses, and any subsequent loss on the mortgage loan may be borne by us. The representations and warranties require adherence to applicable origination and underwriting guidelines, including but not limited to the validity of the lien securing the loan, property eligibility, borrower credit, income and asset requirements and compliance with applicable federal, state and local law.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

178.   This statement was false and misleading because it failed to disclose that despite the risk that it might be required to repurchase a mortgage loan or indemnify purchasers for non-conforming loans, the Company nevertheless had chosen, by pursuing Project Alpha and Project Beta, to breach the representations and warranties it provided to purchasers and insurers of the mortgage loans that it sold.

### 3.   Material Omissions in Violation of Item 303

179.   loanDepot's 2020 10-K was materially misleading because it omitted to disclose, as required by Item 303, events or uncertainties, including known trends, that were reasonably likely to cause loanDepot's financial information not to be indicative of future operating results.   The Registration Statement failed to disclose that the Company's future operating results were likely to diverge from those reported in the Registration Statement, with an unfavorable impact on revenues and income from continuing operations, because the Company would not be able to continue pursuing Project Alpha, Project Beta, or similar projects given the material risks they created and the increased scrutiny that loanDepot would receive as a public company, and the Company failed to disclose those risks or the expected results on future operations.

### C.   Additional Allegations of Scienter

180.   Defendants loanDepot, Hsieh, and Flanagan acted with scienter in that those Defendants knew, or recklessly disregarded, that the public documents and statements issued or disseminated by or in the name of the Company were materially false and

misleading, and knowingly and substantially participated in the issuance or dissemination of such statements.

181. Defendant Hsieh was the driving force of Project Alpha and Project Beta. Hsieh personally directed loanDepot staff, including Ms. Richards, to close mortgage loans as fast as possible, explicitly stating that required documentation should not be obtained because it would slow down loans. Ms. Richards resisted these directives, so Hsieh reduced her responsibilities and gave Tomo Yebisu greater authority in order to accomplish Hsieh's goals. Hsieh personally approved and oversaw the progress of both Project Alpha and Project Beta. He was personally involved in selecting the loans to be processed in these projects and in selecting loanDepot personnel to work on them. Indeed, Project Alpha was initially referred to as the "AH Bot Initiative," which referred to Hsieh by his initials (AH) because the project was undertaken at his direction.

182. Hsieh also attended and participated in meetings wherein the purpose and status of these projects were discussed, and as they progressed, he continued to encouraged and pressured loanDepot staff to ensure that each project achieved its aim of closing loans as fast as possible, even without the necessary documentation to support the loan applications. These meetings included company-wide Town Hall meetings as well as

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

183.   Furthermore, Hsieh personally decreed that the loans designated for Project Alpha would be excluded from the Company's prefunding quality control and internal audit review processes.

184.   Project Alpha and Project Beta were organized, systematic initiatives involving hundreds of employees and were discussed at meetings of senior management as well as Company-wide Town Hall meetings.  Even employees that did not work on Project Alpha were aware of it, including FE-9, who understood that it was a "creative" way to process certain loans.  FE-8 heard from other employees that the Company was "letting things slide" with respect to its protocols and processes.  When she became aware of the Ms. Richards' allegations, she said "I believe everything that Tammy Richards says."  Therefore, in addition to Defendant Hsieh, Defendant Flanagan necessarily was aware of Project Alpha and Project Beta or was reckless in not knowing.

### D.   Loss Causation

185.   From March to September 2021, several disclosures revealed the true situation at the Company and the materialization of risks concealed by the misstatements that are the basis of the Exchange Act claims.  In response, the price of loanDepot's common stock declined, injuring investors and evidencing the materiality of Defendants' misrepresentations.

186.   On March 16, 2021, after the market closed, the Company filed the 2020 10-K.  The 2020 10-K shed light on the Company's loan documentation violations by

disclosing significantly increased loan loss reserves, for possible repurchase claims, of $25.9 million, up from $8.6 million in the prior year.  The 2020 10-K also reported $10 million in payments, realized losses, and other expenses related to the Company's reserves for loan repurchase obligations.

187.   In response, loanDepot's share price fell from a closing from of $22.25 on March 16, 2021, to close at $22.00 on March 17, 2021, and $20.37 at the close of the following trading day—a total decline of 8.45%, and it continued falling thereafter.

188.   On May 3, 2021, before the market opened, loanDepot announced financial results for the first quarter of 2021.  Though the Company reported increased origination volumes, it also reported declining interest rate locks, as well as, lower margins, indicating that it was forced to compete more vigorously for market share.

189.   In response to this news, the Company's stock price fell from a price of $20.94 when the market opened on May 3, 2021, to a price of $19.06 at the close of trading on that day, a decline of over 8.9%.  The Company's stock price continued to fall for eight consecutive trading days: on May 7, 2021, the trading day immediately before the Company filed the 1Q21 10-Q, the stock closed at $14.94, representing a total decline of 28.7%.

190.   On May 10, 2021, during the trading day, the Company filed the 1Q21 10-Q.  The 10-Q revealed that the Company had recognized $4.3 million in realized loan

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

losses in connection with its loan repurchase reserves, versus only $1.6 million in the first quarter of 2020.

191.   In response, loanDepot's stock price continued to fall, closing at $13.70 on May 10 and falling to $12.10 at the close of trading on May 13, 2021—a more than 22% decline from the May 10 opening price to the May 13 closing price.

192.   On August 3, 2021, before the market opened, the Company announced financial results for the second quarter of 2021, including origination volumes that had declined to $34.5 billion, down from $41.5 billion in the prior quarter.

193.   In response, the Company's stock price fell over 9.44% from a closing price of $10.59 on August 2, 2021, to a price of $9.59 at the close of trading on August 3, 2021.

194.   On September 21, 2021, Tammy Richards filed her initial complaint against loanDepot, Hsieh, and other loanDepot executives (the "Initial Richards Complaint," which was later amended on December 21, 2021), and the following day, the *New York Times* electronically published an article concerning the lawsuit, which contained myriad and detailed allegations of loanDepot's purposeful closing of mortgage loans without necessary documentation, including in Project Alpha, at Hsieh's direction.   The article was published in print the following day.

195.   In response to the new information set forth in the lawsuit and the *New York Times* article, the price of loanDepot common stock fell from a price of $7.13 per share

at the close of trading on September 22, 2021, to $6.98 at the close of trading on September 23, 2021, and $6.88 at the close of trading on September 24, 2021—a total decline of over 3.5% as the market digested the new information.

**E.    Presumption of Reliance**

196.   To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(e)    Plaintiffs and other members of the Class purchased loanDepot's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)    loanDepot's common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)    as a regulated issuer, loanDepot filed periodic public reports with the SEC and the NYSE

(h)    loanDepot regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(i)    loanDepot was followed by numerous securities analysts employed by major brokerage firms including BofA Securities, Inc., JPMorgan Chase & Co., Morgan Stanley & Co., LLC, Credit Suisse, Barclays Bank PLC, UBS Securities, LLC, Jefferies LLC, Piper Sandler & Co., William Blair & Company, L.L.C., and JMP Securities LLC, all of which wrote reports that were distributed to the sales force and certain customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace.

197.   As a result of the foregoing, the market for loanDepot's common stock promptly digested current information regarding loanDepot from publicly available sources and reflected such information in the price of loanDepot common stock.  Under these circumstances, all persons and entities who or which purchased or otherwise acquired loanDepot common stock during the Class Period suffered similar injuries

through their purchase of loanDepot common stock at artificially inflated prices and thus, the presumption of reliance applies.

198.   The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of loanDepot common stock.

199.   Without knowledge of the misrepresented or omitted material facts alleged herein, Plaintiffs and other members of the Class purchased shares of loanDepot common stock between the time Defendants misrepresented or failed to disclose material facts, or concealed material risks, and the time the true facts were disclosed, or the time such risks materialized.

200.   To the extent that Defendants concealed or improperly failed to disclose material facts with respect to loanDepot's business, Plaintiffs and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

**F.   No Safe Harbor**

201.   The statutory safe harbor provided by the PSLRA for forward-looking in certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint as the basis for Exchange Act claims.[5]

---

[5] The PSLRA safe harbor does not insulate material misstatements in the Registration Statement because the safe harbor does not apply to statements made in connection with an initial public offering.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

202.   First, many of these statements alleged to be false and misleading relate to historical facts or existing conditions.  Second, to the extent any of these allegedly false and misleading statements may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made.  Third, any purported forward-looking statements were not accompanied by meaningful cautionary language because the risks that Defendants warned of had already come to pass.

203.   To the extent any statements alleged to be false and misleading may be construed to discuss future intent, they are mixed statements of present or historical facts and future intent and are not entitled to PSLRA safe-harbor protection—at least with respect to the part of the statement that refers to the present.

204.   In addition, the PSLRA imposes an additional burden on oral forward-looking statements, requiring Defendants to include a cautionary statement that the particular oral statement is a forward-looking statement, and that "actual results might differ materially from those projected in the forward-looking statement." 15 U.S.C. § 78u-5(c)(2)(A)(i)-(ii). Defendants failed to both identify certain oral statements as forward-looking and include the cautionary language required by the PSLRA.

205.   Furthermore, Defendants did not accompany their statements with meaningful cautionary language identifying important factors that could cause actual results to differ materially from any results projected. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks

identified by Defendants had already passed or manifested.    As alleged herein, Defendants failed to disclose the Company's project of closing thousands of mortgage loans without proper documentation, in violation of applicable regulatory, legal, and contractual requirements, as well as loanDepot's internal controls.

206.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking because at the time each such statement was made, the speaker knew the statement was false or the statement was authorized or approved by an executive officer of loanDepot who knew that the statement was false.

**G.    Exchange Act Counts**

**COUNT III**

**(Violations of Section 10(b) of the Exchange Act, and Rule 10b-5 Thereunder,**

**Against the Exchange Act Defendants)**

207.    Plaintiffs repeat and reallege each of the allegations set forth above, excluding any disclaimers of scienter or fraudulent intent made with respect to the Securities Act claims.

208.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder by the SEC, against the Exchange Act Defendants.

209.    As alleged herein, throughout the Class Period, the Exchange Act Defendants, individually and in concert, directly and indirectly, by the use of the means

or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Exchange Act Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and members of the Class; (ii) artificially inflate and maintain the price of loanDepot common stock; and (iii) cause Plaintiffs and members of the Class to purchase loanDepot common stock at artificially inflated prices.

210. Defendants Hsieh and Flanagan were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

211. As set forth above, the Exchange Act Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to

constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased loanDepot common stock during the Class Period.

212.   In ignorance of the false and misleading nature of the Exchange Act Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for loanDepot common stock, Plaintiffs and other members of the Class purchased loanDepot common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased loanDepot common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of loanDepot common stock declined precipitously, and Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases of loanDepot common stock at artificially inflated prices and the subsequent decline in the price of that security when the truth was disclosed.

213.   By virtue of the foregoing, the Exchange Act Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

**COUNT IV**

**(Violations of Section 20(b) of the Exchange Act Against the Individual Exchange Act Defendants)**

214.   Plaintiffs repeat and reallege each of the allegations set forth above, excluding any disclaimers of scienter or fraudulent intent made with respect to the Securities Act claims.

215.   This Count is asserted pursuant to Section 20(a) of the Exchange Act against the Individual Exchange Act Defendants.

216.   The Individual Exchange Act Defendants had control over loanDepot and made the materially false and misleading statements and omissions on behalf of loanDepot within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their executive leadership positions and, in the case of Hsieh, as the Chairman of the Board, the Individual Exchange Act Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Lead Plaintiffs contend were false and misleading. The Individual Exchange Act Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

217.   In particular, the Individual Exchange Act Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

218.   By reason of such wrongful conduct, the Individual Exchange Act Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Exchange Act Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## VI.   CLASS ACTION ALLEGATIONS

219.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of themselves and all persons or entities that: (a) purchased or otherwise acquired loanDepot common stock in the IPO, or purchased or otherwise acquired loanDepot common stock pursuant and/or traceable to the Registration Statement, and/or (b) purchased or otherwise acquired loanDepot common stock during the period from February 18, 2021 through September 22, 2021, both dates inclusive (the "Class Period"), and were damaged thereby.  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Securities Act Defendant or any Individual Exchange Act Defendant; (iii) any person who was an officer or director of loanDepot during the Class Period; (iv) any entity in which any

Defendant has or had a controlling interest; (v) affiliates of loanDepot, including its employee retirement and benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person in (i)-(v) of this paragraph, in their capacities as such.

220.   The members of the Class are so numerous that joinder of all members is impracticable.  Since the IPO, in which 4,427,500 shares of loanDepot common stock were sold, the Company's common stock has actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands, of members in the Class and that such members are geographically dispersed.  Record owners and other members of the Class may be identified from records maintained by loanDepot or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

221.   Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' wrongful conduct in violation of the Securities Act as complained of herein.

222.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

223.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by Defendants as alleged herein;

(b)   Whether the statements made to the investing public in the Registration Statement and during the Class Period contained material misrepresentations;

(c)   Whether Defendants omitted material facts that they had a duty to disclose;

(d)   Whether, for the Exchange Act claims, the Exchange Act Defendants knew or recklessly disregarded that the misstatements on which the Securities Act claims are based were false and misleading;

(e)   Whether, for the Exchange Act claims, the Exchange Act Defendants acted with the intent to defraud Class members regarding the true value of loanDepot's common stock;

(f)    Whether the Individual Securities Act Defendants and the Individual Exchange Act Defendants were controlling persons of loanDepot; and

(g)    Whether and to what extent shareholders of loanDepot suffered losses due to the acts and omissions alleged herein.

224.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation may make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representative, and appointing Plaintiffs' counsel as Counsel for the Class;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including prejudgment and post-judgment interest, as allowed by law;

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

C.     Awarding Plaintiffs and the Class their reasonable attorneys' fees, expert fees, and other costs incurred in this action; and

D.     Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## VIII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: June 28, 2022                    Respectfully submitted,

**POMERANTZ LLP**

By:  _s/ Jonathan D. Park_

Jeremy A. Lieberman
Jonathan D. Park
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
jpark@pomlaw.com

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
Facsimile: (212) 661-8665
jpafiti@pomlaw.com

*Counsel for Court-Appointed Lead Plaintiff Arthur Gary LaFrano, Additional Plaintiff Adam Doban, and Lead Counsel for the Class*

**THE SCHALL FIRM**
Brian Schall
2049 Century Park East, Suite 2560

1
2

Los Angeles, CA 90067
Telephone: (310) 301-3335
brian@schallfirm.com

3
4

*Additional Counsel for Court-Appointed Lead Plaintiff Arthur Gary LaFrano*

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# APPENDIX A

**loanDepot, Inc. (LDI)**                                                        **Lafrano, Arthur Gary**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 2/11/2021 | 5,000 | $21.9000 |
| Purchase | 4/19/2021 | 5,000 | $18.5000 |
| Purchase | 4/20/2021 | 3,500 | $18.3500 |
| Purchase | 5/6/2021 | 5,000 | $17.9000 |
| Purchase | 5/7/2021 | 6,000 | $15.3500 |
| Purchase | 5/10/2021 | 5,500 | $13.9000 |
| Purchase | 5/11/2021 | 5,000 | $13.2500 |

# APPENDIX B

**loanDepot, Inc. (LDI)**                                                                    **Doban, Adam**

<b>List of Purchases and Sales</b>

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/12/2021 | 12,200 | $21.5758 |
| Sale | 6/22/2021 | (12,200) | $13.0114 |