UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No.  8:21-cv-01449-JLS-JDE                    Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

Present: **Honorable JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

  V.R. Vallery                                         N/A
    Deputy Clerk                                   Court Reporter

ATTORNEYS PRESENT FOR PLAINTIFF:   ATTORNEYS PRESENT FOR DEFENDANTS:

        Not Present                                    Not Present

**PROCEEDINGS:  (IN CHAMBERS)  ORDER GRANTING IN PART AND
                     DENYING IN PART DEFENDANTS' MOTION TO DISMISS
                     (Doc. 76)**

   Before the Court is Defendants loanDepot, Inc. ("loanDepot"), Anthony Hsieh,
Patrick Flanagan, Nicole Carrillo, Andrew C. Dodson, John C. Dorman, Brian P. Golson,
and Dawn Lepore's (collectively, the "loanDepot Defendants") Motion to Dismiss.
(Mot., Doc. 76; Mem., Doc. 76-1.)  Plaintiffs opposed and the loanDepot Defendants
replied.  (Opp., Doc. 79; Reply, Doc. 80.)  The Court took the matter under submission.
(Order, Doc. 81.)  For the following reasons, the Court GRANTS IN PART AND
DENIES IN PART the loanDepot Defendants' Motion to Dismiss.  Specifically, as
explained herein, the motion is granted solely as to the 10(b) claim as to Flanagan, and is
otherwise denied.

## I.   BACKGROUND

   This putative securities class action is brought on behalf of persons and entities
who purchased or acquired shares of loanDepot's Class A common stock pursuant or
traceable to loanDepot's Registration Statement issued in connection with its initial
public offering ("IPO") and who purchased or acquired shares of loanDepot's common
stock from March 16, 2021 through September 22, 2021.  (Amended Consolidated Class
Action Complaint ("CAC"), Doc. 73 ¶ 1.)  Defendant loanDepot is an independent non-

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                         Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

bank retail mortgage lender that provides residential and refinance loans, and personal loan products, to United States borrowers.  (*Id.* ¶ 13.)  Defendant Anthony Hsieh is the founder of loanDepot and served as its CEO until April 26, 2022.  (*Id.* ¶ 30.)  Defendant Patrick Flanagan joined loanDepot in 2017, was appointed CFO of loanDepot's primary mortgage loan origination subsidiary in December 2019, and in January 2021 was appointed CFO of loanDepot.  (*Id.* ¶ 31.)  Defendant Nicole Carillo was at all relevant times the Executive Vice President and Chief Accounting Officer of loanDepot.  (*Id.* ¶ 32.)  Defendants Andrew C. Dodson, John C. Dorman, Brian P. Golson, and Dawn Lepore were at all relevant times directors of the company.  (*Id.* ¶¶ 33-36.)  Hsieh, Flanagan, Carillo, Dodson, Dorman, Golson, and Lepore all signed the Registration Statement or signed consent forms authorizing their names to be included in it.  (*Id.* ¶¶ 30-36.)

LoanDepot's primary source of income is selling mortgage loans; for the first nine months in 2020, it reported that over 95% of its net revenues came from net gains on the origination and sale of loans.  (*Id.* ¶ 25.)  According to its Registration statement, loanDepot is "focused almost exclusively on originating agency-conforming and government mortgage loans … directly to qualified borrowers and selling these loans into the secondary market."[1]  (*Id.* ¶ 26.)  LoanDepot conducted an IPO on February 16, 2021.  Pursuant to the IPO, it filed a Registration Statement, which the SEC declared effective on February 10, 2021, and a Prospectus, which constitutes part of its Registration Statement.  (*Id.* ¶ 52.)  In the IPO, loanDepot announced 3,850,000 Class A shares at $14 per share, and granted the Underwriter Defendants[2] a thirty-day option to purchase up to

---

[1] The secondary mortgage market in the United States is almost entirely dependent on three government agencies: Freddie Mac and Fannie Mae (collectively, the "GSEs", government-sponsored entities that purchase mortgage loans and securitize them, and Ginnie Mae, which allows primary market lenders to securitize mortgage loans guaranteed by the Federal Housing Administration and the Department of Veterans Affairs.  (*Id.* ¶ 22.)

[2] The Underwriter Defendants are Goldman Sachs & Co. LLC, BofA Securities, Inc., Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. LLC, Barclays Capital Inc., Citigroup Global Markets Inc., Jefferies LLC, UBS Securities LLC, William Blair & Company L.L.C., JMP Securities LLC, Piper Sandler & Co., Raymond James & Associates, Inc., Nomura Securities International, Inc., and AmeriVet Securities, Inc.  (*Id.* ¶¶ 39-40.)

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                    Date: January 24, 2023

Title:  Eljon Lako v. Loandepot, Inc. et al

577,500 additional shares of common stock, an option which the Underwriter Defendants exercised.  (*Id.* ¶ 53.)

Plaintiffs' claims stem from three events.  First, they allege that in the run-up to the IPO, loanDepot engaged in an undisclosed scheme to close loans without the required documentation, in violation of regulations, laws, and contractual provisions.  Second, they allege that loanDepot improperly collected double daily interest from refinance borrowers and, upon discovery of the erroneous double collection, made the decision to refund customers only in states with active attorneys general.  Finally, they allege that loanDepot experienced declining gain-on-sale margins as the IPO approached.

**A. Closing Loans without Documentation**

Plaintiffs' allegations regarding closing loans with no or insufficient documentation center around two initiatives, Project Alpha and Project Beta, which they allege Hsieh launched in late 2020 or early 2021.  (*Id.* ¶¶ 81, 87-89.)  According to Plaintiffs, in 2020 loanDepot faced enormous demand for mortgages due to "historically low interest rates and other factors" which caused it to go "on a hiring spree" in order to try to meet its customers' demand.  (*Id.* ¶¶ 55, 57.)  Despite loanDepot's "massive hiring," the company could not keep up with demand, and delays in closing loans affected loanDepot's financial performance.  (*Id.* ¶¶ 59-61.)  Hsieh blamed the delays on adherence to underwriting guidelines, and berated the Chief Operations Officer, Tammy Richards, for "fealty to loanDepot's underwriting processes and for loanDepot's failure to keep pace with the loan origination volume of its largest competitor, Rocket Mortgage." (*Id.* ¶ 61.)[3]

During a production meeting that Richards attended on or about August 20, 2020, Hsieh told loanDepot staff to "immediately close loans regardless of documentation!"

---

[3] As discussed in greater detail below, a number of the allegations in the Complaint are drawn from a complaint filed by Richards against loanDepot, Hsieh, and other loanDepot executives (the "Richards Complaint"). *See Richards v. Loandepot, Inc.*, Case No. 30-2021-01222421 (Super. Ct. Cal. Cnty. of Orange); (*see also* Richards Complaint, Doc. 76-6.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                           Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

(*Id.* ¶ 62.)  After the meeting, Richards informed Jeff Walsh, a Senior Executive Vice President and loanDepot's Chief Revenue Officer, that the instruction to close loans without documentation was illegal.  (*Id.* ¶ 64.)  On or about October 28, 2020, Hsieh told Richards that loanDepot needed to "close all loans … close without credit reports … close without documentation … close all loans!"  (*Id.* ¶ 75.)  Hsieh further told Richards, "[t]rust our borrowers and close loans without documents!  I already paid taxes on these loans and the loans are already shown as revenue!"  (*Id.*)  Richards refused and repeated that credit reports and other documentation were necessary for each loan closing.  (*Id.*)  Hsieh repeated his instructions the next day.  (*Id.* ¶ 76.)

On November 9, 2020, Jeff Walsh sent Richards an email stating "AH looking to fund some loans W/O docs."  (*Id.* ¶ 80.)  In November 2020, Hsieh identified 8,000 loans that were assigned to 200 loan processors, also identified by Hsieh, who were authorized to close the loans without the required documentation and who would receive a bonus if they were able to close the loans before the end of November.  (*Id.* ¶ 81.)  This was Project Alpha.  On November 18, 2020, Brian Rugg, loanDepot's Chief Credit Officer, emailed Richards a spreadsheet containing "the list of loans that we were asked to exclude from our PFQC review as a part of the AH BOT initiative."  (*Id.* ¶ 83.)  "PFQC" refers to prefunding quality control, and the "AH BOT initiative" became Project Alpha.  (*Id.*)  According to FE-1[4], who worked as an underwriter for years before the IPO before becoming a Vice President of Processing, Project Alpha was intended to fast-track certain loan applications that met certain criteria—such as when the applicant was not self-employed—and complaints from applicants who were part of Project Alpha were escalated immediately to Hsieh himself.  (*Id.* ¶¶ 84-85.)  FE-4 reported that while in meetings with Hsieh questions were raised regarding the unusual processes for Project Alpha (and Project Beta, discussed *infra*) and "we were basically told, 'Just move the loans.  Stop questioning.  Just move the loans.'"  (*Id.* ¶ 86.)

---

[4] Ten former employees confidentially provided information contained in the Complaint.  They are each identified using the "FE" designation.  Female-gendered pronouns are used for all of them regardless of gender identity to maintain anonymity.  (*Id.* ¶¶ 42-51.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                    Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

    According to FE-2, she attended a meeting in December 2020 where she and other loan processors received instruction regarding Project Beta, described as a project to close loans with "minimal documentation." FE-5 recalls Project Beta being announced at a company-wide town hall meeting in December 2020 or January 2021, where it was described as a program to close loans with minimal documentation. (*Id.* ¶ 89.) FE-4 reported that Project Beta staff were instructed that the underwriting department would not be involved in Project Beta loans, and they received a document titled "Project Beta Process Flow" which listed criteria to select loans for the project, and a checklist of the documents required for such loans which did not contain all of the requirements imposed by Fannie Mae and Freddie Mac. (*Id.* ¶ 90.) The checklists did not include Form W-2 documents or multiple months of bank statements as required by the GSEs, according to FE-4. (*Id.*)

    FE-3 reported that, even outside of Project Alpha and Beta "[w]e were just told to push things through … It was 'Just fund it' – especially at the end of the month." (*Id.* ¶ 96). Richards filed a complaint against loanDepot, Hsieh, and others on September 21, 2021; according to FE-4, around January 2022, the underwriting department circulated more stringent checklists for loan closings and staff that had previously had authority to approve loans were no longer able to. (*Id.* ¶ 98.) FE-1 reviewed loans investors claimed loanDepot needed to repurchase due to lack of required documentation or other deficiencies, the majority of which were Project Alpha loans. (*Id.* ¶ 99.) In reviewing their files, she found many without any bank statements or documentation of assets, and she found many were to self-employed borrowers, though such borrowers were supposedly excluded from Project Alpha. (*Id.* ¶ 100.) FE-1 and FE-10 both were tasked with reaching out to borrowers to obtain documentation. (*Id.* ¶¶ 100-01.) FE-10 was only able to get such documents about half the time "because the borrower had little incentive to spend time fixing loanDepot's oversights after their loan was already funded." (*Id.* ¶ 101.)

    In its annual report on Form 10-K for 2020 and quarterly reports on Form 10-Q for the first two quarters of 2021, loanDepot disclosed that it had received a demand letter

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                              Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

from one of the senior members of its operations team alleging, inter alia, loan
origination noncompliance and stating that loanDepot's management did not believe the
allegations had merit.  (*Id.* ¶¶ 170-73.)  This demand letter came from Richards (the
"Richards demand letter").  (*Id.*)  The 2020 10-K also stated "[w]e originate and sell
Agency-eligible and non-Agency-eligible residential mortgage loans.  Agency-eligible
loans are underwritten in accordance with guidelines defined by the Agencies, as well as
additional requirements in some cases, designed to predict a borrower's ability and
willingness to repay."  (*Id.* ¶ 175.)  Neither the 10-K nor the 10-Qs disclosed Project
Alpha and Project Beta.  (*Id.* ¶¶ 178-79.)

### B.  Double Interest Collection

    In allegations drawn from the Richards Complaint, Plaintiffs allege that from 2016
until at least December 2019, loanDepot, through its subsidiary Closing USA, LLC,
improperly double-charged daily interest to refinance borrowers due to inaccuracies in
closing disclosure documents.  (*Id.* ¶ 103.)  Richards reported the error to Hsieh and Peter
MacDonald, loanDepot's general counsel.  (*Id.* ¶ 104.)  Richards was informed that Hsieh
decided to only return improperly collected interest to borrowers in states with attorneys
general loanDepot believed would take action against it.  (*Id.*)  The Registration
Statement in the fourth quarter of 2019 stated increases in mortgage originations had led
to "an increase in the number of days between receipt of funds from the originating
lender and the disbursement of those funds to the payoffs on the loan transaction," and
that a "review was initiated in order to refund affected consumers any overage in per
diem charges due to the delay based on loan program and property state requirements."
(*Id.* ¶ 107.)  According to IPO documents, loanDepot earned $127.57 million of interest
income on loans held for sale in 2019, when refinance loans accounted for 59.2% of its
$45 billion loan origination volume.  In 2020, the rate of interest income to loan volume
fell by "more than half" though refinance loans grew to almost 72% of loanDepot's loan
origination volume of $100 billion.  (*Id.* ¶ 112.)  Without collecting the double daily
interest, Plaintiffs allege, loanDepot "has proved unable to approach the rate of interest

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                          Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

income relative to total or refinance loan volume that it represented in the IPO
documents."  (*Id.*)

### C.  Gain-on-Sale Margins

The Registration Statement stated "Market demand in 2020 was driven by a
prolonged period of historically low interest rates.  This demand contributed to gain-on-
sale margins reaching levels that the Company does not believe will be sustained in
future years and could result in decreases in revenue."  (*Id.* ¶ 116.)  Plaintiffs allege that
gain-on-sale margins had already "starkly declined for both purchase and refinancing
loans" when the statement was made.  (*Id.* ¶ 117.)  According to FE-6 and FE-7, demand
began falling at the end of 2020 and workloads and hiring eased in January 2021 before
the IPO.  (*Id.*)  On February 18, 2021, loanDepot reported its gain on sale margin for
2020 was 3.38%, as opposed to the "4.8% gain on sale margin touted in the Registration
Statement."  (*Id.* ¶ 118.)  That day, loanDepot's stock price fell from $27.87 to $25.77,
and closed at $19.04 a few days later on February 23, 2021.  On May 3, 2021, loanDepot
reported its gain on sale margin for the first quarter of 2021 was 2.71%; the price of
common stock was $19.06 at the close of trading on May 3, 2021, and ten days later
closed at $12.10.  (*Id.* ¶ 120-21.)

Plaintiffs allege that the Registration Statement materially misled investors about
loanDepot's loan closing practices and the basis for its loan origination volumes, the
wrongful collection of double interest, and its gain-on-sale margins.  (*Id.* ¶ 122-147.)
They further allege that the 2020 10-K and quarterly reports on Form 10-Q for the first
two quarters of 2021 misrepresented the Richards demand letter, loanDepot's loan
origination and underwriting policies, and failed to make disclosures required by Item
303.  (*Id.* ¶¶ 170-79.)

Plaintiffs bring the following claims.  Count One is for violations of Section 11 of
the Securities Act, 15 U.S.C. § 77k, against all Defendants.  (*Id.* ¶¶ 149-57.)  Count Two
is for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, against the
Individual Securities Act Defendants (*i.e.* all of the loanDepot Defendants except for

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                              Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

loanDepot).  (*Id.* ¶¶ 158-62.)  Count Three is for violations of Section 10(b) of the
Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5,
against loanDepot, Hsieh, and Flanagan (collectively, the "Exchange Act Defendants").
(*Id.* ¶¶ 207-13.)  Count Four is for violations of Section 20(b) of the Exchange Act, 15
U.S.C. § 78t(a), against Hsieh and Flanagan.  (*Id.* ¶¶ 214-18.)

## II.   <u>LEGAL STANDARD</u>

### A.   **Rule 12(b)(6)**

       In deciding a motion to dismiss under Rule 12(b)(6), courts must accept as true all
"well-pleaded factual allegations" in a complaint.  *Ashcroft v. Iqbal*, 556 U.S. 662, 679
(2009).  Furthermore, courts must construe the facts in the light most favorable to the
non-moving party. *See Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir.
2010).  However, "courts are not bound to accept as true a legal conclusion couched as a
factual allegation."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotations
omitted).  The complaint must contain "sufficient factual matter, accepted as true, to
'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting
*Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable inference that the defendant is
liable for the misconduct alleged."  *Id.*  Although a complaint "does not need detailed
factual allegations," the "[f]actual allegations must be enough to raise a right to relief
above the speculative level."  *Twombly*, 550 U.S. at 555.  Thus, a complaint must (1)
"contain sufficient allegations of underlying facts to give fair notice and to enable the
opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to
relief, such that it is not unfair to require the opposing party to be subjected to the
expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th
Cir. 2011).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                    Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

### B.      Rule 9(b)

Claims sounding in fraud are subject to Rule 9(b)'s heightened pleading standard, which requires that a plaintiff "state with particularity the circumstances constituting fraud." *Kearns v. Ford Motor Co*., 567 F.3d 1120, 1124 (9th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)).  "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Id.* (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).

### C.      Personal Securities Litigation Reform Act

The PSLRA's heightened pleading instructions require private securities complaints alleging that the defendant made a false or misleading statement to: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 321 (2007) (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1)-(2)).  "A plaintiff alleging fraud in a § 10(b) action … must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference." *Id.* at 328.

## III.    <u>ANALYSIS</u>

Defendants argue that Plaintiffs fail to plead securities fraud under section 10(b), fail to plead a claim under section 11 of the Securities Act, and fail to state a claim under section 20(a) of the Exchange Act or section 15 of the Securities Act.  They further argue that allegations taken from the Richards Complaint should be stricken.

### A.      The Richards Complaint

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "A matter is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                              Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

'immaterial' if it 'has no essential or important relationship to the claim for relief or the
defenses being pleaded.'" *Clemmons v. Haw. Med. Servs. Ass'n*, 273 F.R.D. 653, 656
(D. Haw. 2011) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993),
*rev'd on other grounds*, 510 U.S. 517 (1994)).   Motions to strike are generally
disfavored, and "will usually be denied unless the allegations in the pleading have no
possible relation to the controversy, and may cause prejudice to one of the parties."
*Corrections USA v. Dawe*, 504 F. Supp. 2d 924, 930 (E.D. Cal. 2007).   The loanDepot
Defendants ask the Court to strike allegations lifted from the Richards Complaint,
arguing that they are hearsay and that "Plaintiffs may not adopt wholesale unproven
allegations as the sole support for their theory."  (Mem. at 17.)  Plaintiffs argue that the
Richards allegations should be credited because they are supported by documentary
evidence, the Ninth Circuit has credited allegations drawn from a complaint filed by an
insider, and allegations can be drawn from a complaint where, as here, the attorneys have
investigated independently, corroborated, and supplemented the allegations.  (Opp. at 20-
21.)

           In securities actions, courts have stricken or disregarded allegations which are
copied from complaints in other cases.  *See ScripsAmerica v. Ironridge Glob. LLC*, 119
F. Supp. 3d 1213, 1262-63 (C.D. Cal. 2015) (collecting cases).  Where "plaintiffs [do]
not personally investigate their claims against defendants," the requirement of Rule 11
that attorneys independently confirm the factual contentions contained in a complaint is
not satisfied.  *See In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005-06 (ND.
Cal. 2008).  So long as the facts contained in a different complaint are investigated
independently by plaintiffs' counsel, it is not improper to rely on such complaints for
evidentiary support.  *See de la Fuente v. DCI Telecomms., Inc.*, 259 F. Supp. 2d 250, 260
(S.D.N.Y. 2003) ("The PSLRA does not require that a plaintiff re-invent the wheel before
filing a complaint"); *see also Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 10 -
0302, 2011 WL 4389689, at *20 (C.D. Cal. May 5, 2011) ("'Investigation' would include
speaking directly to the sources upon which the other complaints rely, or examining the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                          Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

purported internal [] documents which the other complaints describe, or contacting the attorneys whose allegations they copied to discuss the basis for the claims.").

Here, Plaintiffs state in their opposition that Plaintiffs' counsel contacted attorneys in the Richards action to discuss the basis for her allegations.  (Opp. at 20; *see also* CAC at 3-4 ("Plaintiffs' attorneys … confirm[ed] … allegations made in a civil action brought against loanDepot and certain of its executives by its former Chief Operating Officer.").  The former employees that the CAC also relies on corroborate and support many of Richards' allegations, and documentary evidence further corroborates the allegations.  Plaintiffs' attorneys have not merely lifted unsupported allegations wholesale from the Richards Complaint without independent investigation.  Finding evidence of adequate independent investigation by Plaintiffs' counsel, the Court will not strike allegations drawn from the Richards Complaint.

### B.     Project Alpha and Project Beta

The loanDepot Defendants argue that the pleadings regarding loanDepot's loan origination are deficient in a number of respects.  First, they argue that Plaintiffs' failure to identify which agency guidelines were breached is fatal.  (Mem. at 15.)  They further argue that Plaintiffs never actually allege that any of the loans were originated not in accordance with agency guidelines and that none of the FEs have personal knowledge of Project Alpha or Project Beta.  (*Id.* at 15-16.)  The loanDepot Defendants contend that the Richards allegations concerning Project Alpha are hearsay, and that the Project Beta allegations are insufficient because it is described in the pleadings as a project to close loans with "minimal documentation," *i.e.* some amount of documentation.  (*Id.* at 18.)

Plaintiffs argue that "consistent and interlocking" information from internal documents, Richards, and the FEs support a reasonable inference that Projects Alpha and Beta were designed to close loans without the required documentation, and that Hsieh was the driving force behind both projects.  (Opp. at 22.)  They argue that the CAC

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                          Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

establishes that loans were originated without requisite supporting documents even if it does not contain a specific example of such a loan.  (*Id.* at 23.)

The CAC adequately supports an inference that loanDepot engaged in a concerted effort to close loans without sufficient documentation.  The loanDepot Defendants cite *In re Downey Securities Litigation* for the proposition that Plaintiffs must plead which specific agency guidelines were violated.  No. 08-3261, 2009 WL 2767670 at *6 (C.D. Cal. 2009).  However, *Downey* is entirely inapposite; it is a case where the plaintiffs alleged that the *defendant's* underwriting guidelines were inadequate, but rather than citing to the supposedly deficient guidelines, the plaintiffs offered only contradictory confidential witness statements to support their claims.  *Id.*  ("Plaintiff fails to quote or even paraphrase [Defendant]'s underwriting guidelines in its allegations regarding [Defendant]'s underwriting practices, and, instead, attempts to support its allegations with a variety of confidential witness statements.").  Here, the CAC details two initiatives, Projects Alpha and Beta, that existed in order to circumvent various requirements for loans in order to fund them more quickly, which were not disclosed in any statements to investors.  The allegations in the CAC are supported by former employees in positions to know, "who present overlapping and corroborative information." *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022).  Plaintiffs have sufficiently alleged wrongdoing in loanDepot's loan origination procedures to survive the motion to dismiss stage.

**C.      Section 10(b) of the Exchange Act and Rule 10b-5**

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  "The scope of Rule 10b–5 is coextensive with that of Section 10(b)." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                    Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

387 (9th Cir. 2010).  "In a typical § 10(b) private action a plaintiff must prove (1) a
material misrepresentation or omission by the defendant; (2) scienter; (3) a connection
between the misrepresentation or omission and the purchase or sale of a security;
(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss
causation."  *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 157 (2008).

The loanDepot Defendants argue that Plaintiffs have failed to plead an actionable
misstatement or omission, that the Defendants acted with scienter, and loss causation.
Plaintiffs argue that loanDepot's statements about the Richards demand letter misled
investors; that the CAC establishes a strong inference of scienter via the internal
documents it references, Richards's allegations, Hsieh's involvement in Projects Alpha
and Beta, Richards's demand letter, and collective scienter; and that the CAC adequately
pleads loss causation.

### 1.    Actionable Misstatement or Omission

The loanDepot Defendants argue that loanDepot's statements concerning loan
origination and underwriting were not misleading, that loanDepot did not breach any
representations or warranties, that loanDepot did not violate Item 303, and that
loanDepot's disclosures about the Richards demand letter were not misleading.

"[A] statement is misleading if it would give a reasonable investor the impression
of a state of affairs that differs in a material way from the one that actually exists."  *In re
Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010).  The loanDepot Defendants first
note that the 2020 10-K did not promise that every single loan originated by loanDepot
conformed with agency guidelines; rather, the 10-K states that loanDepot "originate[s]
and sell[s] Agency-eligible and non-Agency-eligible" mortgages.  (Mem. at 14.)
Plaintiffs argue that the statement "Agency-eligible loans are written in accordance with
guidelines defined by the Agencies," is a positive statement about loanDepot's
compliance practices which required it to disclose the adverse information regarding
Projects Alpha and Beta.  *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                           Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

(9th Cir. 2016) ("[O]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information.") (cleaned up).  This statement presents a close case, because it can be read as definitional: agency-eligible loans are the loans that are written in accordance with agency guidelines.  Plaintiffs, however, argue that the statement misleadingly assures investors that loanDepot complied with agency guidelines in loans sold to agencies, which the FAC alleges that loanDepot did not.  At the motion to dismiss stage, the Court will adopt Plaintiffs' plausible reading of the statement.

Plaintiffs also allege that the 2020 10-K was materially misleading because it failed to make required Item 303 disclosures.  Item 303 of Regulation S-K requires disclosure of "known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).  The loanDepot Defendants point out, and Plaintiffs do not dispute, that a violation of Item 303 cannot form the basis of a section 10(b) claim.  (Mem. at 20; Opp. at 27 n.13.)  Plaintiffs argue instead that this failure to disclose contributes to an inference of scienter, which is discussed further *infra*.

The Court also finds that Plaintiffs have adequately pleaded that loanDepot's disclosures regarding the Richards Demand Letter were misleading.  According to the CAC, the 2020 10-K and the Form 10-Qs from the first two quarters of 2021 stated that loanDepot had "received a demand letter from one of the senior members" of its operations team alleging, inter alia, "loan origination noncompliance," and that "management does not believe these allegations have merit."  (CAC ¶¶ 171-73.) Plaintiffs argue that the vague reference to "loan origination noncompliance" materially downplays and mischaracterizes Richards's allegations, and that, accepting the allegations in the CAC as true, it would not be possible that loanDepot's management, and Hsieh in particular, believed that Richards's allegations are wholly without merit.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                          Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

"[C]ompanies are not required to engage in 'self-flagellation' by disclosing unproven allegations."  *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 836 (N.D. Cal. 2019).  However, loanDepot here made the affirmative statement that management did not believe that Richards's allegations had merit.  For reasons discussed elsewhere in this Order, Plaintiffs have pleaded sufficient facts showing that members of management – including Hsieh – knew that at least some of Richards's allegations had merit.  This distinguishes the instant case from the cases the loanDepot Defendants rely on.  *See Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 806 (N.D. Cal. 2019) ("the mere existence of an FTC investigation … does not mean that Defendants were aware of the conduct eventually alleged in the FTC Action nearly two years later, or that such conduct violated FTC rules"); *In re Paypal Holdings, Inc. S'Holder Derivative Litig.*, No. 17-162, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (defendants who claimed commitment by company and its board to "strong" and "good" "corporate governance" in soliciting shareholder votes for reelection to the board not required by federal securities law to disclose the existence of an FTC investigation, which was "uncharged, unadjudicated wrongdoing").  Accordingly, this prong is met.

### 2.       Scienter

Plaintiffs are required to, with respect to each act or omission alleged, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4.  The Supreme Court considered what constitutes a "strong inference" in *Tellabs*, finding that "[a] complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324.  "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness."  *Zucco Partners, LLC v.*

---

**CIVIL MINUTES – GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                         Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

*Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009), *as amended* (Feb. 10, 2009)
(quotations omitted).

 The loanDepot Defendants allege that all of the allegations with respect to
Flanagan are conclusory and lack the requisite particularity; the allegations with respect
to Hsieh are supported only by the "unproven Richards complaint"; and the inference
Plaintiffs ask the Court to draw is of a "cartoonishly bad fraud that would be quickly
uncovered" which is much less plausible than the competing inference that Defendants
were doing all that was legally in their power to meet extremely high demand for
mortgages.  (Mem. at 22-25.)  Plaintiffs argue that the CAC sufficiently establishes a
strong inference of scienter for both Hsieh and Flanagan.

 As to Hsieh, taking a "holistic" view of the allegations, Plaintiffs have pleaded
sufficient facts to establish a strong inference of scienter.  *See Zucco*, 552 F.3d at 992.
An email from Jeff Walsh, a Senior Executive Vice President and Chief Revenue Officer,
stated "AH looking to fund some loans W/O docs."  (Doc. 76-6 at 39.)  Brian Rugg, a
Chief Credit Officer, sent an email to Tammy Richards attaching a spreadsheet entitled
"Alpha 11.16.2020", stating "these are the list of loans that we were asked to exclude
from our PFQC review as a part of the AH BOT initiative."  (*Id.* at 41.)  Richards alleged
that Hsieh stated at a meeting with loanDepot staff and individually to her that loanDepot
needed to close loans without documentation, though Richards communicated to Jeff
Walsh that doing so would be illegal.  (CAC ¶¶ 62, 64, 75-76.)  Tomo Yebisu, an
Executive Vice President of Production and Hsieh's business partner for more than 20
years, began rewarding high-performing sales agents with $100 bills, a practice known in
the company as the "Tomo Promo"; when Richards tried to dissuade him from doing so,
he told her loanDepot was Hsieh's company and they had to follow his instructions.  (*Id.*
¶ 77.)  FE-1 and FE-5 report that Yebisu was Hsieh's "right-hand man."  (*Id.*)  FE-1
reported that complaints from applicants within Project Alpha were escalated directly to
Hsieh.  (*Id.* ¶ 85.)  FE-4 attended meetings where Hsieh was present, and when questions

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                          Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

were raised regarding Project Alpha procedures, those present were told to move the
loans and not ask questions.  (*Id.* ¶ 86.)

Hsieh's involvement in Project Beta is less well-established, but his participation
in meetings and the involvement of certain other high-level officials suggests that he
knew about it.  FE-2 was given instructions regarding Project Beta by Sean McClinton, a
Processing Vice President, whom she asserts did not have the authority to waive or
override documentation requirements.  (*Id.* ¶ 93.)  FE-2 attended meetings where Project
Beta was discussed and Hsieh was present.  (*Id.* ¶ 95.)  FE-4 recalled Tomo Yebisu
saying Project Beta staff would receive bonuses of $50 per loan.  (*Id.* ¶ 97.)

Taken as a whole, these and the other allegations in the CAC permit the strong
inference that Hsieh was a driving force behind several initiatives to push loans through
without adherence to underwriting guidelines.  This inference is at least as plausible as
the inference that Hsieh acted in order to originate loans as quickly as possible while
complying with all relevant regulations and guidelines.

The allegations as to Flanagan present a closer case.  Plaintiffs argue that the
involvement of other senior officials in Project Alpha, as well as the scale of Project
Beta, make it "absurd" to suggest that Flanagan did not know about it.  (Opp. at 29-30.)
They further argue that the Richards demand letter establishes Flanagan's scienter,
because it would have been deliberately reckless of him to repeatedly sign off on SEC
filings stating that management did not believe the allegations had merit without
investigating them.  (Opp. at 32.)  These "merely speculative" general allegations are not
sufficient to meet the PSLRA's heightened standard.  *See Bao v. SolarCity Corp.*, No. 14-
1425, 2016 WL 4192177, at *11 (N.D. Cal. Aug. 9, 2016).  Accordingly, this claim is
dismissed as to Flanagan.

### 3.      Loss Causation

"[T]o prove loss causation, the plaintiff must demonstrate a causal connection
between the deceptive acts that form the basis for the claim of securities fraud and the

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                              Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

injury suffered by the plaintiff." *Daou*, 411 F.3d at 1025.  In *Daou*, the Ninth Circuit found plaintiffs had sufficiently alleged loss causation where they alleged that stock prices fell precipitously following disclosures of the company's deteriorating financial condition.  *Id.* at 1026.

Plaintiffs allege that Defendants' misrepresentations were "gradually exposed on five days":

> On March 16, increased loan loss reserves and realized losses partially revealed the falsity of Defendants' statements about underwriting, leading to an 8.45% drop in the stock price. On May 3, loanDepot reported declining interest rate locks and lower margins, revealing the unsustainability of Alpha and Beta, leading to an immediate 8.9% drop.  On May 10, after further losses from loan repurchase reserves, the stock fell 22%. On August 3, the disclosure of lower loan volumes further revealed this unsustainability, leading to a 9% drop.

(Opp. at 33-34.)  Defendants point out that nothing was said to "correct" an alleged misstatement on any of these four days – rather, Plaintiffs require "significant inferential leaps" "that negative financial results announced on these days were caused by Projects Alpha and Beta."  (Reply at 21.)  "At the pleading stage … the plaintiff need only allege that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors."  *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014), *as amended* (Sept. 11, 2014).  Plaintiffs must allege "that the market learned of and reacted to this fraud, as opposed to merely reacting to reports of the defendant's poor financial health generally."  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008).  Here, Plaintiffs have alleged a sufficient causal connection between the fraud and the drop in stock prices to show proximate causation at this stage.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                    Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

The final day on which Plaintiffs allege that the misrepresentations were exposed was September 21, when Richards filed her complaint.  The loanDepot Defendants contend that share prices closed higher than they started the day after the Richards Complaint was filed on September 21, and that, though they dipped over the next few days, they had rebounded by September 27.  (Mem. at 26-27); *see Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1198 (9th Cir. 2021) ("The quick and sustained price recovery after the modest October 9 drop refutes the inference that the alleged concealment of this particular fact caused any material drop in the stock price.").  Plaintiffs argue that a "one day rebound" is not sustained price recovery.  (Opp. at 34.)  Here, on September 20, shares closed at $7.06, falling to $6.94 by the close of trading on September 21.  (Doc. 76-11 at 2.)  By September 24, they fell to $6.88.  (*Id.*)  On September 27, they had rebounded to close at $7.29 – but over the course of that week, the shares closed at lower and lower prices, closing at $6.56 on October 1, and continuing to fall over the following week.  (*Id.*)  The Court agrees with Plaintiffs' assessment that the one-day rebound on September 27 is not the kind of "sustained price recovery" the Ninth Circuit found in *Wochos*.

Plaintiffs have sufficiently alleged loss causation at this stage.  *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate.").

### D.      Section 11 of the Securities Act

"[S]ection 11 of the 1933 Securities Act creates a private remedy for any purchaser of a security if 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  *Daou*, 411 F.3d at 1027 (9th Cir. 2005) (quoting 15 U.S.C. § 77k(a)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                    Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

"The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment."  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403–04 (9th Cir. 1996) (quoting *Kaplan v Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994)).

The PSLRA's heightened pleading requirements do not apply to section 11 claims. *See Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1161 (9th Cir. 2009).  However, if the claim sounds in fraud a plaintiff may nevertheless be subjected to Rule 9(b)'s requirements.  *See Daou*, 411 F.3d at 1027.  Allegations in a complaint may sound in fraud if fraud is a necessary element of a claim, or if the plaintiff "allege[s] a unified course of fraudulent conduct and rel[ies] entirely on that course of conduct as the basis of a claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003).  "Where … a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud."  *Rubke*, 551 F.3d at 1161.  Plaintiffs' section 11 claims do not entirely overlap with their section 10(b) claims, but do rely on the same conduct regarding loanDepot's underwriting practices.  Moreover, the claims regarding loanDepot's double interest charging allege fraudulent conduct.  Rule 9(b)'s heightened pleading standards apply to these claims.  Plaintiffs' claims regarding loanDepot's declining gain-on-sale margins do not sound in fraud, and thus need only clear the bar of Rule 12(b)(6).

Plaintiffs allege that the Registration Statement misrepresented loanDepot's underwriting practices, omitted loanDepot's practice of double interest charging, and misrepresented loanDepot's declining gain-on-sale margins.

### 1.  Underwriting Practices

The first statement alleged to be misleading in the Registration statement is the same as the statement from SEC forms discussed above, and it is misleading for the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                           Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

reasons discussed above.  Plaintiffs also argue that the following statement is misleading: "[w]e are required to follow specific guidelines that impact the way that we originate and service Agency loans, including guidelines with respect to: . . . our staffing levels and other origination and servicing practices; . . . [and] internal controls such as data privacy and security, compliance, quality control and internal audit." (CAC ¶ 125-26.) Plaintiffs argue that the failure to disclose loanDepot's origination of loans without documentation renders this statement misleading.  The loanDepot Defendants argue that failing to follow guidelines does not make the statement any less true.  (Mem. at 28.)  However, the Court finds that the statement that guidelines "impact the way we originate and service Agency loans" implies that loanDepot is in fact following specific guidelines, which is misleading, if, as Plaintiffs allege, Defendants were disregarding agency guidelines in originating and servicing agency loans.

Some of the statements that Plaintiffs have alleged are misrepresentations are not rendered misleading even by taking all of Plaintiffs' allegations in the CAC as true.  The following statement is merely descriptive and is not misleading:

> During the Obama administration, the federal government initiated a number of actions against mortgage loan lenders and servicers alleging violations of FIRREA and the FCA. Some of the actions against lenders alleged that the lenders sold defective loans to Fannie Mae and Freddie Mac, while representing that the loans complied with the GSE's underwriting guidelines. The federal government has also brought actions against lenders asserting that they submitted claims for FHA-insured loans that the lender falsely certified to HUD met FHA underwriting requirements that resulted in FHA paying out millions of dollars in insurance claims to cover the defaulted loans. See "Business—Supervision and regulation—Supervision and enforcement" and the risk factor

**CIVIL MINUTES – GENERAL**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                          Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

> captioned "—We are subject to regulatory investigations and
> inquiries and may incur fines, penalties and increased costs that
> could negatively impact our future liquidity, financial position
> and results of operations or damage our reputation." Because
> these actions carry the possibility for treble damages, many
> have resulted in settlements totaling in the hundreds of millions
> of dollars, as well as required lenders and servicers to make
> significant changes in their practices.

(CAC ¶ 127.)  Another statement from the Registration Statement that Plaintiffs allege is
misleading because of loanDepot's failure to disclose Projects Alpha and Beta merely
describes requirements for loan underwriting and potential penalties loanDepot could
face if it failed to comply:

> While our contracts vary, we provide representations and
> warranties to purchasers and insurers of the mortgage loans
> sold that typically are in place for the life of the loan. In the
> event of a breach of these representations and warranties, we
> may be required to repurchase a mortgage loan or indemnify
> the purchaser or insurer for losses, and any subsequent loss on
> the mortgage loan may be borne by us. The representations
> and warranties require adherence to applicable origination
> and underwriting guidelines, including but not limited to the
> validity of the lien securing the loan, property eligibility,
> borrower credit, income and asset requirements and
> compliance with applicable federal, state and local law.

(CAC ¶ 129.)  Finally, Plaintiffs argue that the statement that loanDepot "[a]chieved
record monthly origination volume of $11.8 billion in November 2020" is misleading
because it does not disclose that that was the month Project Alpha was launched.  (*Id.*
¶ 131.)  Plaintiffs do not argue that the figure itself is incorrect.  It is not enough to point

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                          Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

to accurate financial figures and argue that they are misleading because they are the product of misconduct alleged in the complaint.  *See Metzler*, 540 F.3d at 1070; *see also City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-4844, 2019 WL 6877195, at *12 (N.D. Cal. Dec. 17, 2019).

Next is Plaintiffs' allegation that, in not disclosing Projects Alpha and Beta, the Registration Statement violated Item 303's mandate to disclose trends or uncertainties that have had or could be reasonably expected to have material favorable or unfavorable impacts on revenues.  (CAC ¶¶ 133-34.)  Essentially, Plaintiffs argue, Projects Alpha and Beta were unsustainable given the increased scrutiny loanDepot would face as a public company, so it was necessary to disclose them, as their imminent cessation would cause a decrease in future revenues.  (*Id.*)  At the motion to dismiss stage, the Court will accept this inference.  Plaintiffs have adequately pleaded that not disclosing Projects Alpha and Beta violated Item 303.

The loanDepot Defendants argue that Plaintiffs have not pleaded sufficient facts to show that closing Projects Alpha and Beta would have a material impact on loanDepot's finances.  They argue that, according to the allegations, Project Alpha only involved around 2.7% of the loans loanDepot closed in 2020 and Project Beta's $4 billion in loans "amounts to less than 4% of loanDepot's 2020 originations."  (Mem. at 20.)  Plaintiffs counter that "Alpha involved nearly 8% of fourth quarter originations (in units), and Beta 10% (in dollars)," which establishes materiality.  (Opp. at 23.)

"The materiality of the misrepresentation or an omission depends upon whether there is a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the total mix of information made available for the purpose of decisionmaking by stockholders concerning their investments."  *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (alteration in original) (quotations and citation omitted).  Materiality is an intensely fact-specific inquiry.  *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 700 (9th Cir. 2021).  "As a result, resolving materiality as a matter of law is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                    Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

generally appropriate only if the adequacy of the disclosure or the materiality of the statement is so obvious that reasonable minds could not differ." *Id.* (quotations omitted). The Court will not decide at this stage whether these nondisclosures were material.

### 2.  Double Interest Charging

Plaintiffs allege that the Registration Statement misled investors regarding the wrongful collection of interest from refinance borrowers in several respects.  First, the Registration Statement disclosed a compliance matter regarding per diem interest charges thus: "A review was initiated in order to refund affected consumers any overage in per diem charges due to the delay based on loan program and property state requirements. The review is in the final stages and all refunds are to be remitted to affected consumers during 2020." (CAC ¶ 136.)  Plaintiffs argue that the Registration Statement misled investors by addressing one compliance matter, while not addressing the double charging of interest to refinance borrowers.  However, "[o]ften, a statement will not mislead even if it is incomplete or does not include all relevant facts." *Brody*, 280 F.3d at 1006.  Here, Plaintiffs do not adequately show why disclosure of a "separate and distinct compliance matter", (CAC ¶ 136), would give rise to a duty to disclose the double interest charging. Plaintiffs further allege that the Registration Statement's reports of interest income and net interest expense were misleading because it did not disclose that the results depended on the double interest charging. (*Id.* ¶ 138.)  As above, accurate statements about finances are not necessarily rendered misleading because they are alleged to be the result of conduct alleged in the complaint.

Nevertheless, Plaintiffs adequately allege that other statements were misleading. Plaintiffs allege that the statements that "[n]et interest income reflects interest earned on LHFS offset by interest expense on amounts borrowed under Warehouse Lines to finance such loans until sold," and that "[o]rigination revenue is comprised of fee income earned at origination of a loan, interest income earned for the period the loans are held, and gain-on-sale on loans upon disposition of the loan" are misleading.  (*Id.* ¶ 140 (emphasis

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                              Date: January 24, 2023
Title:  Eljon Lako v. Loandepot, Inc. et al

omitted).)  Plaintiffs allege these are misrepresentations because loanDepot's double
interest charging involved collecting interest that was not "earned," as each affected
refinance loan had not yet closed.  (*Id.* ¶ 141.)  Moreover, double interest charging
involved collecting interest unrelated to the period loans are held, because loans are not
"held" by loanDepot until they are closed.  (*Id.*)  The loanDepot Defendants argue that
Plaintiffs allege no facts showing the amount or scope to establish materiality.  (Mem. at
30.)  They further argue that Plaintiffs allege no facts suggesting that loanDepot's
approach of only refunding borrowers in certain states was inappropriate.  (*Id.* at 31.)

The Court finds that there are sufficient facts to give rise to an inference of
materiality at the motion to dismiss stage.  (*See* CAC ¶ 112.)  Moreover, as Plaintiffs
point out, they have alleged that "the charges were inherently improper under state law
and contract" so whether a jurisdiction-by-jurisdiction analysis was appropriate is not
relevant at this stage.  (Opp. at 25.)

### 3.  Decline in Gain-on-Sale Margins

Plaintiffs allege that the Registration Statement's assertion that loanDepot's gain-
on-sale margins in 2020 had "reach[ed] levels that the Company does not believe will be
sustained in future years and could result in decreases in revenue" was misleading
because loanDepot had already experienced a material and worsening decline in gain-on-
sale margins at the time of the IPO.  (CAC ¶ 145.)  The loanDepot Defendants argue this
statement is not misleading because the Registration Statement provided that loanDepot
experienced "elevated gain on sale margins . . . through the third quarter of 2020," which
"normalize[d] at something higher than historical levels during the fourth quarter of
2020."  (Mem. at 32.)  They further argue that the Registration Statement is not
misleading because it does not "affirmatively create an impression of a state of affairs
that differs in a material way from the one that actually exists."  *Brody*, 280 at 1006.  The
Court agrees.  The Registration Statement creates the impression that gain-on-sale

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.  8:21-cv-01449-JLS-JDE                          Date: January 24, 2023

Title:  Eljon Lako v. Loandepot, Inc. et al

margins fell between the third and fourth quarters and would likely continue to fall.  This does not materially differ from the state of affairs Plaintiffs allege.

In sum, while the Court finds that certain allegedly misleading statements are insufficient to state a claim, because the Court finds that other statements are sufficiently alleged to be misleading, the Section 11 claim survives.

**E.      Section 15 of the Securities Act and Section 20(a) of the Exchange Act**

The loanDepot Defendants argue that Plaintiffs have failed to plead primary violations of section 10(b) and section 11, and they therefore have necessarily failed to plead section 15 and section 20(a) claims.  (Mem. at 32.)  Because the Court does not dismiss either the section 10(b) or section 11 claims, these claims also survive.

**IV.   CONCLUSION**

For the foregoing reasons, the loanDepot Defendants' Motion is GRANTED as to the section 10(b) claim against Flanagan and is otherwise DENIED.  Plaintiffs' section 10(b) claim as to Flanagan is DISMISSED WITHOUT PREJUDICE.  Plaintiffs are granted leave to amend their complaint consistent with the terms of this order.  Any amended complaint must be filed within **fourteen days** of the issuance of this order.

Initials of Deputy Clerk:  vrv