IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR GARY LAFRANO and ADAM DOBAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>LOANDEPOT, INC.; ANTHONY HSIEH; PATRICK FLANAGAN; NICOLE CARRILLO; ANDREW C. DODSON; JOHN C. DORMAN; BRIAN P. GOLSON; DAWN LEPORE; GOLDMAN SACHS & CO. LLC; BOFA SECURITIES, INC.; CREDIT SUISSE SECURITIES (USA) LLC; MORGAN STANLEY & CO. LLC; BARCLAYS CAPITAL INC.; CITIGROUP GLOBAL MARKETS INC.; JEFFERIES LLC; UBS SECURITIES LLC; WILLIAM BLAIR & COMPANY, L.L.C.; JMP SECURITIES LLC; PIPER SANDLER & CO.; RAYMOND JAMES & ASSOCIATES, INC.; NOMURA SECURITIES INTERNATIONAL, INC.; and AMERIVET SECURITIES, INC.,<br><br>Defendants. | Case No. 8:21-cv-01449-JLS-JDE<br><br>**DECLARATION OF JONATHAN D. PARK IN SUPPORT OF PLAINTIFFS' MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND FOR ATTORNEYS' FEES, EXPENSES, AND SERVICE AWARDS TO PLAINTIFFS** |

I, Jonathan D. Park, declare:

1. I am a member of the Bar of the State of New York. I am Of Counsel with the law firm of Pomerantz LLP, Court-appointed Lead Counsel and counsel to Lead Plaintiff Arthur Gary LaFrano ("LaFrano" or "Lead Plaintiff") and Additional Plaintiff Adam Doban ("Additional Plaintiff," and together with Lead Plaintiff, "Plaintiffs") in the above-captioned action. I have been admitted to appear *pro hac vice* in this action and am Court-appointed Class Counsel for the Settlement Class. ECF No. 128.[1] I have been actively involved in all aspects of the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision and participation in all material aspects of the Action, and if called as a witness, could and would testify competently thereto.

2. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Plaintiffs' Motions for (1) Final Approval of Class Action Settlement and (2) Attorneys' Fees, Reimbursement of Litigation Expenses, and Awards to Plaintiffs, filed concurrently herewith.

3. The Settlement creates a gross settlement fund of $3,500,000, plus accrued interest. After attorneys' fees, reimbursement of litigation expenses, award to Plaintiffs, and claims administration costs, the remaining funds ("Net Settlement Fund") will be distributed to a Settlement Class consisting of all persons and entities who purchased or otherwise acquired shares of loanDepot's Class A common stock pursuant or traceable to the Company's registration statement issued in connection with the Company's February 16, 2021 initial public offering, and all persons or entities who purchased or

---

[1] All capitalized terms not otherwise defined shall have the same meanings ascribed to them in the Stipulation and Agreement of Settlement ("Stipulation"). ECF No. 112.

acquired shares of loanDepot's Class A common stock between March 16, 2021 and September 22, 2021, inclusive, and were damaged thereby. Stipulation, ¶1(xx).[2]

4. The memorandum in support of Plaintiffs' motion for final approval of the Settlement ("Final Approval Brief"), filed herewith, sets out a full narrative of this case. Also filed herewith is a memorandum in support of Plaintiffs' motion for attorneys' fees, reimbursement of litigation expenses, and awards to Plaintiffs ("Fee Brief"). The purpose of this declaration is to attest to certain facts set out in those briefs that cannot be supported by citation to the docket or other public documents.

## I.   RELEVANT BACKGROUND AND PROCEDURAL HISTORY

5. A summary of Plaintiffs' allegations and the procedural history of this Action are set forth in the Final Approval Brief, part II.

## II.  OVERVIEW OF THE SETTLEMENT NEGOTIATIONS

6. On January 24, 2023, the Court granted in part and denied in part Defendants' motion to dismiss, finding that certain alleged misstatements (including those relating to loanDepot's gain-on-sale margins) were not adequately alleged to be materially false or misleading, and that scienter was not adequately alleged for loanDepot's CFO, Patrick Flanagan. ECF No. 82.

7. The Parties then discussed a case schedule as well as the possibility of resolving the Action. The Parties engaged Jed D. Melnick, Esq. of JAMS to assist them as a mediator. Mr. Melnick is a well-respected mediator with substantial experience mediating securities class actions. The Parties participated in an all-day mediation

---

[2] Excluded from the Settlement Class are: (i) Individual Defendants; (ii) the immediate family members of the Individual Defendants; (iii) the officers and directors of loanDepot during the period beginning February 11, 2021 through the end of the Class Period, and their immediate family members; (iv) any firm, trust, corporation, or other entity in which any Defendant has, or had during the period beginning February 11, 2021 through the end of the Class Period, a majority ownership interest; and (v) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person or entity under clauses (i)- (iv). Stipulation, ¶1(xx).

1  session on May 4, 2023, prior to which they exchanged detailed mediation statements;
2  Defendants appended several internal loanDepot documents in support of their positions.
3  The Parties agreed to stay discovery pending the mediation session.

4        8.     The May 4 mediation was not successful. Accordingly, both Plaintiffs and
5  Defendants served document requests on each other. However, the Parties continued to
6  discuss settlement with Mr. Melnick's assistance. Eventually, Mr. Melnick issued a
7  mediator's proposal to resolve the Action for $3.5 million, which both sides accepted on
8  June 23, 2023 and memorialized in a term sheet executed on June 26, 2023 (the "Term
9  Sheet"). That same day, the Parties informed the Court of the development and asked
10 the Court to stay proceedings while they negotiated the Stipulation. ECF No. 106. The
11 Court granted the stay, directing Plaintiffs to file a motion for preliminary approval of
12 the Settlement by July 26, 2023. ECF No. 108.

13       9.     Per the Court's order, Plaintiffs moved for preliminary approval of the
14 Settlement on July 26, 2023 (the "Preliminary Approval Motion"). ECF Nos. 109-112.
15 Eljon Lako, who filed the initial complaint in this matter and a purported member of the
16 Settlement Class, filed an opposition to the Preliminary Approval Motion. ECF No. 113.
17 Plaintiffs filed a reply in support of the Preliminary Approval Motion, responding to
18 Lako's arguments. ECF No. 114. Plaintiffs included an expert declaration from Dr.
19 Zachary Nye with their reply. ECF No. 114-4. The Court then continued a scheduled
20 hearing on the Preliminary Approval Motion to provide Lako an opportunity to respond
21 that declaration (ECF No. 118), and Lako did so on October 23, 2023 (ECF No. 119).
22 Plaintiffs then moved for leave to file a sur-reply in response to Lako's October 23, 2023
23 submission. ECF Nos. 121-123.

24      10.    On December 8, 2023, the Court held a hearing on Plaintiffs' Preliminary
25 Approval Motion and, that same day, issued an order conditionally granting the motion.
26 ECF No. 126. That order required Plaintiffs to submit supplemental counsel

4
DECL. OF JONATHAN D. PARK IN SUPPORT OF MOTIONS FOR FINAL APPROVAL
AND FEES; CASE NO. 8:21-CV-01449-JLS-JDE

1  declaration(s) and a revised notice packet within ten days. *Id.* Plaintiffs did so on December 18, 2023. ECF No. 127.

11. On January 5, 2024, the Court granted the Preliminary Approval Motion, as revised by the supplemental counsel declaration(s) and revised notice packet. ECF No. 128.

12. In the opinion of Lead Counsel, the Settlement is fair, reasonable, and adequate and a strong result for the Settlement Class. The Settlement confers a benefit on the Settlement Class, eliminating the risk of continued litigation under circumstances where a more favorable outcome is less likely. Additionally, the Plan of Allocation is a fair and reasonable method for distributing the proceeds of the Settlement to Settlement Class Members. The Court should approve both the Settlement and the Plan of Allocation.

13. As set forth herein and in the Final Approval Brief, the Settlement represents approximately 11% of the total maximum damages of $32 million under Plaintiffs' best-case scenario as estimated by Plaintiffs' damages expert, despite significant risk. This maximum estimated amount could only be recovered if: (1) all the claims alleged survive to trial; (2) a class was certified and was not decertified; (3) a jury adopted Plaintiffs' expert's damages model; (4) Plaintiffs defeated any appeals; and (5) Defendants have the ability to pay such a judgment.

14. A lump sum cash settlement in the face of these challenges is a favorable outcome. In light of these circumstances, and especially when the Settlement is the product of comprehensive legal and factual investigation and arm's-length negotiations between experienced counsel and overseen by a well-respected mediator, there is ample support for a finding that the Settlement is fair, reasonable, and adequate.

15. For litigating this case on a contingency basis and negotiating this settlement, Lead Counsel requests a fee of 28% of the Settlement Amount, or $980,000, plus interest earned thereon, and reimbursement of litigation expenses of $90,000. This

DECL. OF JONATHAN D. PARK IN SUPPORT OF MOTIONS FOR FINAL APPROVAL AND FEES; CASE NO. 8:21-CV-01449-JLS-JDE

fee request is within the reasonable range of percentages typically awarded to class counsel in securities class actions in the Ninth Circuit.

16. The favorable reaction of the members of the Settlement Class also supports the reasonableness of the Settlement and the fee request. Pursuant to the Notice,[3] objections to the Settlement must be received by March 29, 2024. To date, there have been no objections to the Settlement. Declaration of Elise Murasso of Angeion Group Regarding: (A) Notice Mailing; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections Received ("Murasso Decl."), ¶24. Plaintiffs intend to address objections, if any, received by the March 29, 2024 deadline in their reply papers in support of final approval.

17. Pursuant to the Notice, requests for exclusion from the Settlement must be received by March 29, 2024. The Claims Administrator, Angeion Group ("Angeion"), received two requests for exclusion to date. *Id.*, ¶23.

### III. NOTICE PROCEDURES

18. At Lead Counsel's direction, and pursuant to the Preliminary Approval Order, on January 29, 2024, the Claims Administrator published the Summary Notice in *Investor's Business Daily* and electronically on *PR Newswire*. Murasso Decl., ¶13 & Exhibits B and C thereto. The Claims Administrator also published the Long Notice, Proof of Claim and Release Form ("Claim Form"), Stipulation, and Preliminary Approval Order on Angeion's Settlement-specific website, which became operational on or before January 25, 2024. *Id.* ¶¶14-16.

19. To date, 15,618 potential Settlement Class Members were notified of the Settlement by mailed Postcard Notice. *Id.* ¶12. On January 25, 2024 (the "Notice Date"),

---

[3] "Notice" collectively refers to the Notice of (I) Proposed Settlement; (II) Motion for an Award of Attorneys' Fees and Litigation Expenses; and (III) Settlement Fairness Hearing ("Long Notice"), and the Postcard Notice ("Postcard Notice"). *See* Murasso Decl., Exs. A and D; *see also* ECF No. 127, Ex. C (revised Long Notice); Ex. A-4 to the Stipulation (Postcard Notice)

Angeion mailed the Postcard Notice to 205 individuals and organizations identified in the transfer records proved by loanDepot's transfer agent. *Id.* ¶¶4-6. On the Notice Date, Angeion mailed an additional 2,507 Postcard Notices to nominees on its proprietary database of known securities brokers, dealers, banks, and other Nominees to be used for notifying record holders of settlements. *Id.* ¶10. Since the Notice Date, Angeion has received requests from Nominees to (i) send the Postcard Notice to the Nominee for distribution, or (ii) send the Postcard Notice directly to the Nominee's customers, whose contact information the Nominee provided to Angeion. *Id.* ¶10. Through March 15, 2024, as a result of requests from 11 Nominees, Angeion sent an additional 12,860 Postcard Notices, directly or indirectly to potential members of the Settlement Class. *Id.* ¶11. As a result of the efforts described above, as of March 15, 2024, Angeion has mailed a total of 15,618 Postcard Notices to potential Settlement Class Members and Nominees. *Id.* ¶12.

## IV.   PLAN OF ALLOCATION

20.   Pursuant to the Preliminary Approval Order, the Long Notice fully described the proposed Plan of Allocation. Murasso Decl., Ex. D at ¶¶35-60. Lead Counsel created the proposed Plan of Allocation after consulting with Plaintiffs' expert and the Claims Administrator, designing it to reimburse Settlement Class Members in a fair and reasonable manner. The Plan of Allocation is based in part on the same damages report Plaintiffs used to estimate their maximum recoverable damages, and it closely tracks Plaintiffs' theory of the case.

21.   If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Settlement Class Members who timely submit appropriate Claim Forms. Pursuant to the Plan of Allocation, the Claims Administrator, under the direction of Lead Counsel, will determine each authorized claimant's pro rata share of the Net Settlement Fund based upon each claimant's Recognized Loss. Each similarly situated authorized claimant will receive a pro rata

share of the Recognized Losses attributed to their claim, with that share to be determined by the ratio that the authorized claimant's allowed claim bears to the total allowed claims of all authorized claimants.

22. The Plan of Allocation is tailored to compensate the losses of the Settlement Class Members equitably and is based upon time periods during the Class Period when various corrective disclosures occurred, consistent with loss causation principles of *Dura Pharma. Inc., v. Broudo*, 544 U.S. 336 (2005). Because Plaintiffs' claims under the Securities Act—which do not require proof of scienter and do not have loss causation as an element of the claims—apply only to shares registered by the Registration Statement, the Plan of Allocation increases losses on purchases of such shares by 25%, reflecting Lead Counsel's determination that such claims are less difficult and risky to prove.

## V. THE FAIRNESS AND REASONABLENESS OF THE SETTLEMENT

23. The proposed Settlement is the culmination of careful and efficient litigation followed by protracted arms' length settlement negotiations. The Parties reached the Settlement after Lead Counsel had thoroughly investigated the claims and consulted with a damages expert. The investigation included (i) reviewing loanDepot's SEC filings, press releases, conference calls, and other public statements during the Settlement Class Period; (ii) reviewing public documents, reports, announcements, and news articles concerning loanDepot, including research reports by securities and financial analysts; (iii) reviewing and incorporating into the Complaint the pleadings and filings in a lawsuit filed by loanDepot's former Chief Operating Officer, Tammy Richards, and contacting Richards' counsel; and (iv) retaining an investigator to independently interview former loanDepot employees. In the course of that investigation, Lead Counsel obtained and analyzed internal loanDepot documents as alleged in the Amended Complaint.

24. Further, although Defendants had not formally produced discovery before the Parties reached a settlement-in-principle, Defendants produced and Plaintiffs reviewed documents submitted by Defendants in connection with the May 4, 2023 mediation.

25. Lead Counsel, who are experienced securities class action attorneys, evaluated the prospects of obtaining a better result if the case were to go forward, taking into account the risks of this case surviving on the pleadings, at summary judgment, at the class certification stage, and at trial. Accordingly, Plaintiffs faced multiple procedural hurdles and significant merit-based risks involved with protracted litigation. Lead Counsel carefully considered each of these risks before agreeing to the Settlement.

26. Although Lead Counsel believes Plaintiffs' claims are meritorious and sufficiently pleaded, there is no certainty that Plaintiffs would defeat Defendants' anticipated motion for summary judgment. Defendants would likely challenge whether Plaintiffs had adequately alleged the elements of falsity, scienter, and loss causation.

27. Plaintiffs faced the risk that the Court or jury would find that Defendants' statements were not actionably false or misleading. With respect to the claims asserted under the Securities Exchange Act of 1934, Plaintiffs also faced the risk that the Court or jury would find that Defendants did not make misstatements with scienter, as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Plaintiffs also faced the risk that the Court or jury would reject their theory of loss causation or would accept Defendants' negative causation arguments.

28. Plaintiffs also faced the challenge of obtaining class certification and establishing market efficiency. Achieving class certification would have involved a "battle of the experts" and was fraught with uncertainty and risk, as Plaintiffs could not be assured that the fact finder would credit the testimony of Plaintiffs' expert over Defendants' expert. Based on Lead Counsel's experience, a market efficiency expert would likely cost between $70,000 and $100,000. If the Court did not certify the class,

it is unlikely that any individual investor or group of investors would have filed individual claims to recover their damages from purchasing loanDepot Stock as it would be uneconomical for them to bring individual cases.

29. Plaintiffs also faced the risk of establishing the proper amount of damages. Estimating aggregate damages can be challenging due to, among other things, assumptions that must be made regarding trading activity. Plaintiffs calculated that damages were approximately $32 million assuming it prevailed on all its claims. Based on Lead Counsel's experience, retaining an expert to opine and testify as to loss causation and damages could cost several hundred thousand dollars.

30. Discovery would also be costly and time consuming. Plaintiffs would likely need to review thousands of documents and take numerous depositions of Defendants, loanDepot employees, and third parties, as well as experts regarding the underwriting standards applicable to loanDepot's mortgage business. Further, since the Class Period began in 2021 and depositions would not start until at least well into 2024, it is possible that evidence could be lost because as time passes memories fade and it would be a challenge to obtain usable deposition or in-person testimony. Even if Plaintiffs succeeded in getting discovery and obtaining a favorable judgment at trial, Plaintiffs would still have to enforce the judgment and defeat any applicable appeals.

## VI. THE FEE APPLICATION IS FAIR AND REASONABLE.

31. The Notice informed Settlement Class Members of Lead Counsel's intent to apply for an award of attorneys' fees in an amount not to exceed 28% of the Settlement Fund, plus interest, and for reimbursement of counsel's litigation expenses in an amount not to exceed $90,000. Murasso Decl., Ex. D, ¶¶5, 68. As set forth in the Fee Brief, 28% of the common fund that counsel's efforts created falls in line with similar awards that courts in this circuit have granted, and is merited here.

32. Lead Counsel achieved a highly favorable result for the Settlement Class at risk and expense to themselves. Throughout this litigation, Lead Counsel was committed

to the interests of the Settlement Class and invested the time and resources necessary to resolve the Settlement Class's claims. As a result of this Settlement, Settlement Class Members will receive compensation for their losses and avoid the risk of no recovery at all.

*Lead Counsel Work and Experience*

33. Lead Counsel took this case on a contingency basis, with no assurance of success or receiving any compensation.

34. The total amount of time expended by attorneys and professional staff employed by Lead Counsel is 809.37 hours. A listing of the professionals at Lead Counsel's firm who worked on this matter, the number of hours spent by each such professional, their hourly rates, and their work on this matter is set forth in detail below. The total value of the services performed in this case by counsel, based upon counsel's current rates, is $639,009.75.

35. During the PSLRA-mandated discovery stay, Lead Counsel reviewed loanDepot's public filings and statements during the alleged Settlement Class Period, as well as other news reports and public information relating to loanDepot. Lead Counsel analyzed underwriting guidelines applicable to loanDepot's mortgage business. Lead Counsel reviewed the pleadings and filings in the lawsuit filed by loanDepot's former Chief Operating Officer, Tammy Richards, and contacted Richards' counsel. Lead Counsel also retained an investigator to interview former loanDepot employees. In the course of that investigation, Lead Counsel obtained and analyzed internal loanDepot documents as alleged in the Amended Complaint. Through its investigation, Lead Counsel determined the scope and strength of the claims Plaintiffs could bring, including the appropriate Class Period, corrective disclosures, and the corresponding misrepresentations and/or omissions.

36. Ultimately, Lead Counsel ably synthesized these facts into a compelling pleading, the amended complaint. ECF No. 73. Lead Counsel then researched, prepared,

and filed an opposition (ECF No. 79) to Defendants' motion to dismiss (ECF No. 73), which was granted in part and denied in part (ECF No. 82). Thereafter, Lead Counsel met and conferred with Defendants and filed a Joint Rule 26(f) Report. ECF No. 89. Further, Lead Counsel prepared and served a detailed a mediation statement, analyzed Defendants' mediation statement, and conducted a full-day mediation on May 4, 2023 before a neutral mediator, Jed D. Melnick, Esq. of JAMS. The mediation was unsuccessful, so Lead Counsel served discovery requests on Defendants and began preparing responses to discovery requests served by Defendants. Lead Counsel then pursued further settlement talks that led to both Defendants and Plaintiffs accepting a mediator's proposal on June 23, 2023.

37. As reflected in the resume of Lead Counsel firm Pomerantz LLP, attached hereto as **Exhibit 1**, Lead Counsel are experienced and skilled practitioners in the securities litigation field and have a successful track record in such securities, shareholder and other complex class action cases.

38. Attached as **Exhibit 2** is a chart, in the format specified by the Court's procedures, showing Lead Counsel's hours, rates, and lodestar. Attached as **Exhibit 3** hereto is a chart of Lead Counsel's expenses incurred in this Action. Both of these charts were prepared from Lead Counsel's records kept in the regular course of business and were reviewed for accuracy.

39. If Lead Counsel's request of 28% of the Settlement as attorneys' fees is granted, Lead Counsel would receive a fee of $980,000. This fee award would represent a lodestar multiplier of approximately 1.53. This multiplier is well within the range of multipliers that courts in this Circuit have typically awarded in securities class actions.

40. Moreover, in addition to the time expended to date, Lead Counsel will expend additional time preparing Plaintiffs' reply in support of final approval, preparing for and attending the final approval hearing, directing the claims administration process,

and filing a motion for final distribution, and will not seek additional compensation for this work.

### The Caliber of Opposing Counsel

41. Defendants' Counsel, consisting of Gibson Dunn & Crutcher LLP and Orrick, Herrington & Sutcliffe LLP (together "Defense Counsel"), vigorously represented their clients. Defense Counsel are highly respected defense firms with substantial securities litigation experience and resources. In the face of this opposition, Plaintiffs and Lead Counsel were nevertheless able to develop a case that was sufficiently strong to defeat, in part, Defendants' motion to dismiss and persuade Defendants to settle on terms that were favorable to the Class during settlement negotiations at and after the mediation.

### The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High Risk, Contingent Securities Cases

42. Lead Counsel undertook this class action on a contingency fee basis. I summarize above and Plaintiffs further describe in the Final Approval Brief the risks counsel assumed in bringing these claims to a successful conclusion. Those same risks are relevant to an award of attorneys' fees.

43. From the outset, Lead Counsel understood that they were embarking on a relatively complex, expensive, and probably lengthy litigation with no guarantee of being compensated for the investment of their time and money that the case would have required. Lead Counsel has received no compensation during the course of their involvement in this litigation.

44. The commencement of a class action does not guarantee a settlement. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint and to take a case to trial. Only as a result of such efforts will sophisticated defendants engage in serious settlement negotiations at meaningful levels.

45. As a result of persistent efforts in the face of substantial risks and uncertainties, Lead Counsel achieved a fair, adequate, and reasonable recovery for the Settlement Class. In consideration of Lead Counsels' efforts and the favorable result achieved, I believe that a 28% fee is reasonable and that the Court should approve it.

*The Reaction of the Class to the Requested Fee*

46. As noted above, 15,618 potential Settlement Class Members received notice of the Settlement. Murasso Decl., ¶12. The deadline for objections is March 29, 2024. To date, the Claims Administrator has not received any objections to any aspect of the Settlement, including the requested attorneys' fees. Murasso Decl., ¶24. Lead Counsel has not received any objections to any aspect of the Settlement, including the requested attorneys' fees, other than Lako's opposition to the Preliminary Approval Motion. Plaintiffs intend to address any timely objections in their reply papers in support of final approval. The deadline to request exclusion from the Settlement is March 29, 2024. As discussed above, Angeion received two valid requests for exclusion. *Id.* ¶23.

**VII. REIMBURSEMENT OF EXPENSES IS FAIR AND REASONABLE.**

47. As detailed in Exhibit 3 hereto, Lead Counsel has incurred $109,390.89 in litigation expenses in connection with the prosecution of the Action. Exhibit 3's listing of the expenses counsel incurred was compiled from the firm's regularly maintained records.

48. From the outset, Lead Counsel was aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the case was successfully resolved. Lead Counsel also understood that, even assuming that the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of the funds they advanced to prosecute this action. Thus, Lead Counsel took significant steps to minimize expenses whenever practicable without jeopardizing the vigorous and efficient prosecution of the case.

49.     Prior to filing the Preliminary Approval Motion, Lead Counsel estimated that its litigation expenses would not exceed $90,000, and the Settlement Class was informed that Lead Counsel would seek reimbursement of its litigation expenses in an amount not to exceed $90,000. However, Lead Counsel did incur expenses exceeding that amount, including in the course of addressing Lako's opposition to the Preliminary Approval Motion. Lead Counsel does not, however, seek reimburse of expenses exceeding $90,000, consistent with the Notice.

50.     In light of the relatively complex nature of securities class action litigation and the difficulties in pleading and ultimately proving liability, as well as proving loss causation and damages at trial, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Settlement Class.

## VIII. A NOMINAL AWARD TO LEAD PLAINTIFFS IS WARRANTED.

51.     Plaintiffs Arthur Gary LaFrano and Adam Doban seek an award of $5,000 each, or $10,000 in total, for their time and effort overseeing this action pursuant to the PSLRA. The work Plaintiffs completed on behalf of the Settlement Class include, *inter alia*, filing a lead plaintiff motion, review of pleadings, communicating regularly with counsel, discussing the Settlement with counsel, providing evidence of their transactions in loanDepot Stock, and evaluating offers made during settlement negotiations and the eventual Settlement. Plaintiffs have been actively involved and put the concerns of the Settlement Class at the forefront.  Declarations from LaFrano and Doban detailing their efforts and expressing support for the Settlement are attached as **Exhibit 4** and **Exhibit 5** hereto.  As explained in the Fee Brief, awards of similar magnitude are commonly awarded to lead plaintiffs in securities class actions. They are necessary to ensure that these plaintiffs are not made worse off for their service to the class.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 15, 2024           *s/ Jonathan D. Park*

                                      Jonathan D. Park